[Sac. No. 2567. Department Two.—September 3, 1918.]

LAWRENCE L. WOLFSEN, Appellant, v. MARY SMYER, Administratrix, etc., et al., Respondents.

CONTRACTS—AGREEMENT TO MAKE WILL—SPECIFIC PERFORMANCE.—Prior to the addition of subdivision 7 to section 1624 of the Civil Code in the year 1905 an oral promise to convey an estate by will was enforceable in equity under certain conditions, and is still enforceable where the promise was made prior to that time.

ID.—ENFORCEABILITY OF CONTRACT—CHANGE OF CONDITION—EQUITY.— Courts of equity will, under special circumstances, enforce a contract to make a will where in reliance upon the contract the promisee has changed his condition and relations so that a refusal to complete the agreement would be a fraud upon him.

ID.—INADEQUACY OF CONSIDERATION—FINDINGS SUPPORTED BY EVIDENCE. In this action to impress a trust on all of the property of the de-

fendant's intestate based upon an alleged verbal agreement to leave the property to the plaintiff, it is held that the evidence fails to show that adequacy of consideration sufficient to warrant specific performance.

ID.—EXISTENCE OF CONTRACT—FINDING UNNECESSARY.—Where, in an action to impress a trust on all the property of a deceased person based upon an alleged verbal agreement to will the property to the plaintiff, it is found that the plaintiff is not entitled to relief by reason of the inadequacy of the consideration, it is not necessary in order to sustain the judgment to find as to whether the alleged agreement was in fact made.

ID.—IMMATERIAL FINDINGS.—When there are sufficient findings on issues made in the case to support a judgment, it is immaterial that there is no finding, or an erroneous finding, on some other issue which, if made, or differently made, would not compel any different conclusion from that reached by the findings which were actually made.

APPEAL from a judgment of the Superior Court of Merced County. F. B. Ogden, Judge Presiding.

The facts are stated in the opinion of the court.

Peck, Bunker & Cole, and Ostrander, Tuttle, Griffin & Shaffer, for Appellant.

E. A. Williams, G. G. Graham, and Croop & Croop, for Respondents.

LORIGAN, J.—The claim of appellant in this action is that Silas Bowman, now deceased, and himself, in 1890, while appellant was a minor, entered into a verbal agreement whereby plaintiff was to live with said Bowman during the lifetime of the latter as his son, and help and work and care for him as a son, and attend to his interests as such, and in consideration thereof said Bowman would at his death leave all his property to the plaintiff; that plaintiff faithfully performed all the conditions and terms of the agreement on his part to be performed as a dutiful, affectionate, and considerate son should do; that notwithstanding said full performance on the part of plaintiff, said Silas Bowman died without having made any conveyance of his property to plaintiff or any will disposing of the same in his favor, but, on the contrary, died intestate. Based on this claim plaintiff brought this action to have a trust impressed on all the property left by decedent in his favor, and from a decree adverse to him and an order denying his motion for a new trial he appeals.

The court found that neither in 1890 nor at any other time did Silas Bowman agree with plaintiff that he would at the time of his death give or leave to plaintiff any of his property owned by him, and that it was not true that plaintiff had performed all the provisions and covenants of the alleged agreement on his part to be performed. The court further found that the claim of plaintiff asserted in his complaint that, pursuant to said alleged agreement, he had during all the years from 1890 till the death of deceased given his efforts, care, services, and attention to the affairs, business, and property of said Bowman, foregoing all opportunity for his own personal advancement, profit, and improvement, was not true; that it was not true that for the services rendered by said plaintiff to said Bowman in his lifetime compensation could not be made in money or that the same were not so compensated.

The contention of the appellant here is that the evidence in the case does not support any of these findings as made by the court, but, on the contrary, clearly showed a contract entered into between Bowman and himself as claimed by him and full performance thereof on the part of plaintiff, and that the court erred in finding differently.

The case was tried by Honorable F. B. Ogden, of the superior court of Alameda County, sitting in the superior court of Merced County, and in disposing of the case in that court the learned judge rendered an opinion as follows:

"This is an action to enforce a trust. The plaintiff claims that in the year 1890 he engaged with one Silas Bowman to give his attention, labor, and services to said Bowman, in return for the promise of said Bowman to leave to said plaintiff all of the property possessed by him, said Bowman, at the time of his death.

"From the testimony of plaintiff it appears that with his father and two sisters he migrated to America from Germany in the fall of 1881.

"The father was a widower and the three children were small—the plaintiff about seven years of age, having been born in 1874. Upon the advent of the family to this country they went to the residence of Henry Wolfsen, an uncle of the plaintiff. In December of 1881, or the first part of January, 1882, this uncle took his nephew, this plaintiff, to the home of Silas Bowman, where he was installed as a member

thereof. Silas was a bachelor, residing with his niece on a ranch in Merced County. What arrangements were made between Henry and Silas for the keeping of plaintiff, the plaintiff did not know, as he was unable to understand the English language, in which the conversation between the older men was carried on.

"It appears that the father of the plaintiff on his arrival here had but little of this world's goods and was without any means of earning the livelihood for the family except through his manual labor. So pressed was he for funds that he was compelled to place one of his daughters with a family and the other found lodgment in an institution.

"In the family of Silas the plaintiff was made welcome and took the place of a son. He did many of the chores, brought in wood, cooked meals on occasions, washed dishes, and clothes, and as he matured in years gave of his advice freely, to Silas, when that advice was sought.

"During his residence in the Bowman home the plaintiff went regularly to school, there first learned the English language, and at the age of twenty-one or two graduated from the grammar grades.

"During the minority of plaintiff his wants were supplied by Silas, who bought the school books necessary, gave to plaintiff such money as he needed, and apparently did everything that a father ordinarily does for a son.

"It also appears that Silas indulged his foster son, the plaintiff, in outdoor sports, and gave to him, as well, the privilege of earning money on his own account. In this connection it appears that the plaintiff worked on neighboring farms, sold watermelons, killed coyotes for bounty, and in other ways made spending money for himself.

"The father of plaintiff in 1887, or 1888, left Merced and went to the Kittleman Plains, and it appears in evidence that in 1890 he sent a communication to the plaintiff, suggesting that the plaintiff join him there. This was communicated to the decedent Silas, and it is claimed by the plaintiff that Silas then asked the plaintiff if he desired to go with his father, and on being answered in the negative then said, if the plaintiff would stay with him—Silas—and help him on the place, upon the death of Silas, he—Silas—would leave all his property to plaintiff. Plaintiff avers that said Silas repeated this promise on sundry occasions thereafter.

"After graduating from the grammar grades the plaintiff bought some well-boring tools, and commenced taking contracts for sinking wells. The money to make the purchase, it may be assumed, was the result of the savings of the plaintiff while a minor. For about a year and one-half the plaintiff followed this latter vocation, still living with Silas, and performing about the place much of the same work as theretofore, and adding to his patrimony by investing in livestock.

"In 1898, the plaintiff made a trip to Alaska for the purpose of looking over that field, and, if possible, of bettering himself there. His money on hand was about $375; one hundred dollars of which was loaned him by Silas, and $275 the result of his earnings. The trip was made with full consent of Silas. In Alaska the plaintiff stayed one year, earning enough money to pay his way and returning with about four hundred dollars. With this sum he returned to Silas the one hundred dollars advanced by him, and resumed the old life upon the farm, and there remained for a short time, when again, with the consent and advice of Silas, the plaintiff made a trip to his father at Kittleman Plains. There it was proposed that the plaintiff file on a homestead in the government domain.

"This was done in February, 1900, and the land entered upon was improved by a small cabin purchased by the plaintiff in compliance with the necessities of the act of Congress. The plaintiff states, however, that the time he was away from the Bowman place was only about two weeks, although it was his intention at the time of making the entry to comply with the law as to residence, etc. Prior, however, to this entry, and in 1898, he had purchased 160 acres of land adjoining the Bowman place, paying therefor $250.

"During this time it appears that the plaintiff and Silas had stock which used the lands of Bowman and plaintiff in common. The holdings of the plaintiff were, in 1902, augmented by his purchase of an additional 160 acres of land, for which he paid $975, and by a further purchase in 1903 of still another quarter-section, costing $1,175.

"In 1904, plaintiff married and took his bride with him to the Bowman place, where the three, Silas, the plaintiff, and his wife, remained until 1907.

"During this time part of the household expenses were borne by plaintiff and part by Silas. The wife of plaintiff

contributed to the domestic happiness and economy by the usual wifely duties. It appears that no stated amount was fixed upon as the share of the plaintiff, and he cannot tell just what amount he paid in as his contribution to the expenses of the family. During all of this time down to 1907 the plaintiff bought and sold stock and used in common with Bowman these lands for pasture. In 1907, at the suggestion of Bowman, the plaintiff moved to a house on one of the quarter-sections, taking with him thirty-five head of stock, which belonged to him, Bowman being the possessor of about seventy or seventy-five head. From this new home plaintiff continued the business of well-boring and cattle-raising, and in 1908 added to his possessions by a further purchase of 160 acres, this time buying from Silas. Part of the time to 1907 the decedent Silas was away visiting in the eastern states, and during such time the plaintiff was in charge of the ranch of Bowman, or gave it some supervision, when it had been rented by Bowman.

"In 1912, decedent Silas made a trip to Honolulu, and in 1913 made another to San Diego, at which latter place he died from paralysis. February, 1914, was the date of death. The estate left by him was approximately thirty thousand dollars. In August, 1913, before leaving, decedent Silas made a lease to plaintiff of his ranch of 750 acres at the agreed price of eighty cents per acre. The lease was for one year with the privilege of three. A portion of the Bowman place, about fifty acres, was reserved from the lease, whereon was the house and surroundings, but it appears that even this reservation was not actual, as the plaintiff had the privilege of it except when occupied by Silas.

"Upon telegraphic advice from San Diego, that Silas Bowman was *in extremis,* the plaintiff accompanied by Thomas Scofield, a step-nephew of Silas, journeyed to San Diego, and arrived in time to see him die. Plaintiff paid the hospital bills, undertaker, and incidental expenses of the trip, and was repaid by the administratrix, upon her appointment.

"Many witnesses were examined upon the trial of this case—forty-three in all.

"More than thirty witnesses called in behalf of the plaintiff testified as to the faithfulness of the plaintiff in his devotion to decedent, Silas, and to the expressions of affection of Silas toward the plaintiff. To many of them Silas had

declared that the relatives should get nothing, and that his ranch and property should go to the plaintiff on his death. To many of his friends Silas declared that he had already made deeds to the plaintiff and that they were contained in a tin box then in a Merced bank.

"One or two witnesses stated that Silas had declared that he had promised the boy—meaning the plaintiff—to give him, the plaintiff, the property on the death of him—Silas—in return for the labor of plaintiff.

"From the testimony of all the witnesses it does affirmatively appear that Silas Bowman had a sincere affection for his foster son—the plaintiff—and often expressed the intention of leaving all of his property to him except that he—Silas—intended to aid Thomas Scofield to some extent.

"It further appears from the evidence that upon the return of the plaintiff and said Scofield from San Diego with the remains of Silas, a meeting of some of those interested in the estate was held in the office of W. B. Croop, a practicing attorney of Merced. Before the meeting Mr. Croop, who had for several years acted as the attorney for the decedent, Silas Bowman, went to the bank which held the papers of the decedent, secured the tin box in which they were contained, and on the arrival of Thomas Scofield and Mrs. Smyer, niece of decedent, the plaintiff proceeded to open the aforesaid box. The key to this box, it appears, was held by Scofield. On opening the box neither will, deed, nor other paper was found, which could throw light upon the intended disposition of the property of Silas Bowman. Twice afterward the box was inspected with no better results. Mr. Croop also testified that he had never drawn any deed wherein Silas Bowman made conveyance to the plaintiff.

"After the appointment of Mary Smyer as administratrix of the estate of Silas Bowman, the administratrix requested the plaintiff to give to her the lease under which he held the Bowman ranch, and the plaintiff replied that he could not comply as this lease was the only evidence of his right to the possession thereof.

"It also appears in evidence that at another time, after said appointment, and when the plaintiff was being reimbursed for his outlay on the San Diego trip, he was asked if he had any other claim against the estate, and he answered in the negative.

"Evidence was also introduced on behalf of the defendant tending to show that at one time after the return of the plaintiff from Alaska, the decedent, Silas, told the plaintiff that he had given to him all that he—Silas—intended to give and that he need not expect more. Other witnesses for the defense testified that the plaintiff had informed them that he did not expect anything from the estate of Silas Bowman, because Silas had too many relatives. It further appears that the plaintiff asked of the attorney for the administratrix if he could hold the Bowman place under the lease.

"There can be no doubt that under the law of this state as it existed prior to 1905, an oral promise to convey an estate by will, under certain circumstances, was enforceable in equity, and is still enforceable, where the promise was made prior to said date.

"In the case of *Owens* v. *McNally,* 113 Cal. 449, [33 L. R. A. 369, 45 Pac. 711], Mr. Justice Henshaw, speaking for the supreme court, said (quoting *Jaffe* v. *Jacobson,* 48 Fed. 21, [1 C. C. A. 24]) : 'We concede the law to be that a court of equity will specifically enforce a promise to leave to another the whole, or a definite portion of one's estate as a reward for peculiar personal services rendered, or other acts done by the promisee, which are not susceptible of a money valuation, and were not intended to be paid for in money, provided the consideration has been substantially received at the promisee's death.' (Through inadvertence the word 'promisee's' was quoted in the California case instead of 'promisor's.')

"And in the opinions in *Owens* v. *McNally* the following language was also used:

" 'The question whether relief should be granted or denied in a particular case addresses itself peculiarly to the conscience of the chancellor.'

"And the rule laid down in 'Pomeroy on Specific Performance' is cited with approval in *McCabe* v. *Healy,* 138 Cal. 84, [70 Pac. 1008], as follows:

" 'Courts of equity will under special circumstances enforce a contract to make a will . . . where in reliance upon the contract, the promisee has changed his condition and relations so that a refusal to complete the agreement would be a fraud upon him.'

"In addition, before such enforcement can be had, the court will be more strict in examining into the nature and circumstances of such agreements than any others, and will require very satisfactory proof of the fairness and justness of the transaction. (*McCabe* v. *Healy, supra.* See, also, *Owens* v. *McNally, supra; Flood* v. *Templeton,* 148 Cal. 374, [83 Pac. 148] ; *Baumann* v. *Kusian,* 164 Cal. 582, [44 L. R. A. (N. S.) 756, 129 Pac. 986].)

"The strictness with which courts of equity look upon such agreements has its philosophy in the rule that the stability of the possession and title to property must be preserved.    Mr. Justice Melvin in *Blanc* v. *Connor,* 167 Cal. 722, [141 Pac. 218], says: 'It is asserted that this is a class of cases sometimes arising in fraud and abounding in perjury.'

"But while this observation may have no just application to this case at bar, yet the rule that oral contracts affecting title to real estate are enforceable in equity, doubtless gives vigor to the art of imagination and the science of auto-suggestion.

"The legislature realizing this, in 1905 provided by statute that agreements to devise or bequeath property must be in writing.    (Civ. Code, sec. 1624.)

"From the foregoing statement of the facts in the case it will be seen that considerable doubt exists—viewing the testimony most favorably to the plaintiff—whether a case has been made out authorizing the extraordinary remedy sought by plaintiff.

"The case at bar is more nearly like the case of *Baumann* v. *Kusian, supra,* than any other decided by our supreme court. In the case cited two girls were taken into the family by their benefactress, and it was claimed by them that their benefactress agreed to make them heirs of her estate if they complied with her wish to come west with her.    The court said: 'We are of the opinion that it also sufficiently appears that there was no such showing of adequacy of consideration for the alleged promise . . . as to appeal to a court of equity as requiring specific performance in the face of the rule that the contract must be just and fair.'

"In the case at bar the plaintiff gave up nothing of value to become an inmate of Silas Bowman's home.    Unable to speak the English language, he was there taught it.    Carefully nurtured by loving hands, he received also an education at the expense of his benefactor.    Small wonder was it, that

when in 1890 the father of the plaintiff sought to gather together his children, that the plaintiff revolted and would not return. His affections had been won by his foster parent, and this fact best portrays the kindness of Silas Bowman.

"Unlike the case of *McCabe* v. *Healy, supra,* the plaintiff did not give his entire time or services, to Silas. During the period of plaintiff's minority he had ample time to work for others, and did so. As one of the witnesses for the plaintiff testified, 'he'—Silas Bowman—'told me that there was not much work on the ranch and he wanted to have Lawrence go out and work that he might understand the value of money.'

"That the lessons taught by the foster parent found lodgment in a fruitful field is shown by the fact that in 1907 the plaintiff had in livestock almost one-half the number owned by his foster parent, and land in proportion.

"So does it appear that in every venture of the plaintiff to better his condition he had the active co-operation of Silas.

"No thought of self-aggrandizement possessed Silas Bowman when the welfare of the plaintiff was concerned, and the court can only marvel that no provision was made carrying out the expressed intention of Silas Bowman to provide well for his protege.

"That the plaintiff, after his graduation from the grammar school, looked to his own emolument, there seems to be no doubt. The venture in well-boring, the acquisition of stock and land, in which Silas Bowman had no interest, so indicates. The trip to Alaska was likewise taken to provide the financial interest of plaintiff solely.

"The work and services of plaintiff from the age of seven years to twenty-one must have been of inconsiderable value as opposed by the return given him in the way of education, and comfort and nurture. And when we consider the fact that during all of this time of minority the plaintiff had the privilege of earning money for himself, we must conclude that the net value to Silas Bowman of the services of the plaintiff was small and was capable of estimation in dollars and cents. The value of the services of the plaintiff to his foster parent after majority was negligible. A careful perusal of the testimony fails to show any considerable service performed by the plaintiff for Silas Bowman after the trip to Alaska, while it does appear that Silas loaned to his foster child money and otherwise cared for him.

"If, then, the case at bar does not portray such a one (even viewed most strongly for plaintiff) as appeals to the conscience of a chancellor to award specific performance, it becomes unnecessary to declare upon the weight of evidence. But in passing it is not improper to say that evidence of the declaration of the plaintiff to the effect that he 'expected nothing from the estate of Silas,' and that 'he had no claim against it,' are inconsistent with the idea that a binding obligation had been assumed by Silas Bowman to leave all of his estate to the plaintiff. . . .

"It follows from the views expressed that the plaintiff is not entitled to the remedy sought."

An examination and consideration of the record on appeal under the claims made by appellant for a reversal satisfies us that in the foregoing decision of the case after submission to him the trial judge stated all the material facts in evidence and correctly applied the law to them. It also fully answers the objections as to the sufficiency of the evidence to sustain the findings challenged and the further claim that the findings do not support the judgment. We are fully satisfied with the reasoning and conclusions of the trial court and the opinion of the judge thereof embodying them is hereby adopted as the opinion of this court.

It will be observed that in writing the opinion, though reciting the facts, the court devotes but little discussion to the question whether the contract asserted by appellant to have been made with Silas Bowman was in fact made, the view of the court being that even if such contract had been made, still, the case presented by appellant was not, for the reasons given by the court and sanctioned by the authorities, of such a character as would warrant specific performance. After the filing of its opinion and when the court came to make findings it found, however, that the contract asserted by appellant as having been entered into between himself and the deceased had not been made, and one of the claims of the appellant is that this finding is not supported by the evidence, but is contrary thereto. While we think that there was sufficient evidence in the case warranting the court in making the finding it did, still, whether that finding was or was not correctly made could not affect the judgment. The other findings made, with or without any finding on the issue of the making or nonmaking of the contract, support the judgment, and the

rule is that when there are sufficient findings on issues made in the case to support a judgment it is immaterial that there is no finding, or an erroneous finding, on some other issue which, if made, or differently made, would not compel any different conclusion from that reached by the findings which were actually made.

One point on a ruling as to evidence is made. The court refused to reopen the case on the motion of counsel for appellant in order that he might introduce in evidence a deed from one Bent to appellant, made October 4, 1899. A witness for respondent—Elmer Hill—had testified that he heard Silas Bowman, in July or August, 1898, or 1899, say to plaintiff: "You had better move to your own place," and the averred purpose of the intended offer of the deed by plaintiff was to contradict this witness by showing that appellant had not at the dates mentioned by the witness Hill any place of his own to move to, not having acquired the deed from Bent. As the witness Hill was not at all confident as to the exactness of the dates given by him, this evidence would have been of doubtful efficacy as impeaching testimony. The matter of these dates did not affect the substance of the statement made by Bowman, and even if it was error to have refused it, it was too trivial to warrant a reversal of the judgment.

The judgment appealed from is affirmed.

Melvin, J., and Wilbur, J., concurred.