[Civ. No. 7262.   Third Dist.   Mar. 8, 1947.]

J. H. BELL, Appellant, v. HUBERT B. SCUDDER, as Real Estate Commissioner, etc., Respondent.

Geary & Tauzer and A. Dal Thomson for Appellant.

Fred N. Howser, Attorney General, J. Albert Hutchinson, Lenore D. Underwood and Carl Wynkoop, Deputy Attorneys General, for Respondent.

THOMPSON, J.—This is an appeal from a judgment of the superior court discharging a preliminary writ of mandamus which was issued to require the Real Estate Commissioner of California to show cause why he should not unconditionally renew the broker's license.

Upon petitioner's application for renewal of his license, the commissioner gave written notice of a hearing on the question of the broker's asserted ''dishonest dealing'' and lack of good faith in procuring a personal option to buy a farm belonging to his former clients, Mr. and Mrs. King, for $8,500 without disclosing the fact that he already had a purchaser who agreed to and subsequently did buy the land for $10,000. At the commissioner's hearing, involving the question of a lack of good faith in that transaction, the broker's license was renewed on condition that it be suspended for sixty days. The

petitioner then applied for a writ of mandamus to require the commissioner to issue the renewal of his license unconditionally. At the trial, the transcript of testimony and proceedings before the commissioner was, by stipulation, received in evidence. The transaction regarding the purchase and sale of the King property was fully disclosed in that record. No further evidence on that subject was adduced at the trial. The only additional evidence was the introduction of two deeds. The superior court adopted findings favorable to the respondent.

It was determined by the trial court that the commissioner did not exceed his jurisdiction in directing the issuance of the broker's license subject to its suspension for sixty days, on account of petitioner's failure to satisfactorily establish his good faith and reputation pursuant to section 12 of the Real Estate Act, as amended in 1937 (Stats. 1937, p. 2124; Deering's Gen. Laws, 1937, Act 112), and that the evidence regarding the purchase and sale of the King property was adequate to support the commissioner's suspension of the renewed license for the period of sixty days.

Judgment was accordingly rendered dismissing the petition for a writ of mandate. From that judgment this appeal was perfected.

█ The evidence is conflicting with respect to the good faith of petitioner in the sale of the King property. The record shows that petitioner has been a real estate broker in Santa Rosa for more than twenty-five years. Several prominent persons testified to his good reputation. There is no evidence to the contrary, except his conduct in the King transaction. This case hinges entirely on that transaction. Mrs. Rose Prinz, a licensed saleswoman, was employed by the petitioner. She had worked for him in that capacity for twenty-one years. Mr. C. Rapley, a licensed salesman, had served him, as such, for about three years. Mr. and Mrs. Manuel King owned a 14-acre farm near Healdsburg. December 16, 1942, Mrs. Prinz wrote a letter to Mr. King soliciting the privilege of selling their ranch, for a stipulated commission, in behalf of her employer. She asked for a description of the property and the lowest cash price. December 27, 1942, the Kings sent to the petitioner their written authorization to act as their agent for a term of sixty days, to sell the property for the sum of $10,500 for the agreed commission of 5 per cent

in the event of a sale. The listing of that property was placed in the files of the petitioner. In the latter part of February, 1944, Mrs. King wrote a letter to Mr. Bell requesting the withdrawal of the property from the market. The listing, however, was not removed from the files, but was thereafter used by petitioner and his salesmen in an effort to sell the property as an agent of the Kings. There is evidence that the continuation of that agency was recognized by both parties. April 14, 1943, in response to an inquiry by Mrs. Prinz, the Kings wrote a letter to her, saying that a party whom the agent sent to inspect the property "did not show up," and stating that, at petitioner's request, they had decided to "reduce the price to $8500.00 net to us your commission to be added to this price." That letter constitutes a recognition of the continuing existence of the agency.

July 12, 1943, A. L. Fritchey and his wife met Mr. Bell in his office in Santa Rosa and told him they wanted to buy a chicken ranch. They were introduced to his salesman, Mr. Rapley, who first showed them other properties, which were rejected because they were too high priced. The salesman then procured from their files the listing of the King property, which Mr. Fritchey testified the salesman told him had been held at $12,000 or $12,500, but which "has recently been reduced to $10,500," and he said "I want to show it to you." After seeing the property the Fritcheys told Mr. Bell "I might pay $10,000." Mr. Bell replied, "Well, I don't know, we will have to get in touch with the Kings to find out if they will reduce the price to $10,000." He added that, "So far as I am concerned, . . . we only make five per cent commission and I would be willing to waive my $25 which covers the $500" difference in price. The Fritcheys then went to Glendale. The Kings never met the purchasers until the sale had been completed. The saleswoman, Mrs. Prinz, phoned Mrs. King, saying, "We think we have your ranch sold. . . . The *man* will—only wants to give eight thousand dollars. . . . Will you take eight thousand dollars?" Mrs. King replied, "Absolutely not." Mrs. Prinz then said, "Well, that is all right, that is all right, I can work him up the other five hundred." Mrs. Prinz then asked Mrs. King to send a telegram to J. H. Bell saying they would take $8,500 for the property, *so they could show the message "to the man who was buying,* because eight thousand was all he wanted to give."

In response to that request, Mr. King sent a telegram to Mr. Bell, July 15, 1943, saying, "Will accept $8500 net, . . . ." The following day Mr. Bell sent a telegram to the Fritcheys at Glendale, saying, "Your offer for King property accepted. Wire 10 percent deposit. Can complete deal in fifteen days." The Fritcheys telegraphed Mr. Bell, "Agreeable to accept King proposal as discussed with your firm." At the request of petitioner the Kings saw Mr. Bell in his office on July 17th. Mrs. Prinz was not present. Mr. Bell told them "He had the place sold to a man from Chicago, it was positively sold, and for us to give him fifteen days' option on the place *to get the thing straightened up.*" The Kings suggested that it was strange they had been paid no deposit. Mr. Bell replied, "If that is what you want *we* will give you a deposit," and he took from his pocket an envelope and handed them $50. That same day, at the request of petitioner, an option to purchase the property by J. H. Bell for $8,500, within fifteen days, was prepared in his office and signed by the owners and Mr. Bell. The property was conveyed to the Fritcheys for $10,000 August 2, 1943, through the Sonoma County Abstract Company. The Kings received only $8,500. The balance of the $10,000 purchase price was paid to and retained by J. H. Bell, without the knowledge of the Kings.

At no time during the transaction were the Kings informed that petitioner actually sold the property for the sum of $10,000, or that he claimed the right to the difference between that sum and $8,500, as commissions for the sale, or otherwise. The Kings never met the purchasers until after the sale was consummated. They were led to believe that the property was sold for $8,500, plus the broker's stipulated 5 per cent commission. In support of the judgment, we may assume the contract with Mr. Bell to sell the property for $8,500, plus 5 per cent commission, pursuant to King's letter of April 14, 1943, was a modified renewal of the original contract, and that the agent was bound, in the exercise of good faith, to disclose to the owners the entire facts of that transaction.

It is true that both Mrs. Prinz and Mr. Bell testified that the former personally negotiated with the Kings to buy the property for herself, and that the latter was going to help her finance the transaction. But that plan was never divulged to the Kings. That theory was contradicted by the evidence of Mrs. King, who testified that Mrs. Prinz told her, "We

think we have your ranch sold. . . . The *man* will—only wants to give eight thousand dollars.'' Mrs. Prinz fraudulently persuaded Mrs. King to send a telegram to Mr. Bell, saying she would accept $8,500, so they could show the message ''to the *man* who was buying, because eight thousand was all *he* wanted to give.'' When Mrs. King positively told Mrs. Prinz they would not accept $8,000, the saleswoman replied, ''Well, that is all right, . . . I can work *him* up the other five hundred.'' Mrs. Prinz told Mrs. King, when she was asked if the sale was to be made to Mr. and Mrs. Thompson, who were previously discussed as prospective purchasers, that it was not being sold to the Thompsons. She added, ''No, this party is from Chicago.'' Mrs. Prinz received no part of the purchase price.

The foregoing evidence is ample to support the judgment of the trial court, and the order of the Real Estate Commissioner suspending the renewed license for a period of sixty days, for failure on the part of petitioner to fulfill the requirements of section 12 of the Real Estate Act. (*Rattray* v. *Scudder*, 28 Cal.2d 214 [169 P.2d 371, 164 A.L.R. 1356].)

█ There is evidence to support the conclusion of the court that the agency of Mr. Bell to sell the property for a commission of 5 per cent was not terminated by the owners, in spite of the fact that Mrs. King wrote him a letter the latter part of February, 1943, signifying her desire to withdraw it from the market. The listing of the property had not been taken from the petitioner's files. He was evidently still trying to sell the property, as their agent, and had notified the Kings that he had sent a prospective purchaser to inspect the property. That party, however, did not appear, for on April 14th, about six weeks after the withdrawal letter was sent, upon request of Mrs. Prinz, petitioner's saleswoman, Mrs. King wrote the real estate firm that they decided to ''reduce the price to $8,500.00 net to us *your commission to be added to this price.*'' The last mentioned letter refutes the petitioner's contention that the agency was terminated. Clearly that letter implies that the owners assumed the agency was still in force, and that the real estate commission was thereby fixed at 5 per cent of the selling price. █ Regardless of the information contained in the last mentioned letter that the owners had agreed to take $8,500 net, plus 5 per cent commission, the broker negotiated a sale for $10,000, by misrepre-

senting to the purchasers that the owners had held it at $12,500, but had recently reduced the price to $10,500. He told the purchasers he was getting only 5 per cent commission for the sale. While that transaction was pending, Mrs. Prinz, the saleswoman, phoned Mrs. King that the purchaser "only wants to give eight thousand dollars." That statement was not true. No suggestion was made to the owners that the broker desired to buy the property in his own behalf. All communications tended to deceive the owners into believing that the broker was negotiating for the sale with a bona fide purchaser other than himself. The real selling price was never communicated to the owners. At the request of Mrs. Prinz, Mrs. King sent them a telegram consenting to sell the property for $8,500. The Kings were notified that their offer to sell for $8,500 had been accepted, and that the deal would be completed within fifteen days. They then went to Mr. Bell's office on July 17th to close that sale. Mr. Bell told them "he had the place sold *to a man from Chicago.*" He then asked them for a fifteen-day option "to get the thing straightened up." Upon demand, he paid them a deposit of $50, which he took from an envelope he was carrying in his pocket. Misled by the misrepresentations and failure to disclose the real facts of the actual transaction, the Kings then executed the option to purchase, which was drawn in the name of Mr. Bell, in his own office. They had no knowledge of the fact that he was selling the property to the Fritcheys for $10,000. He failed to inform them of that fact. He pretended to both parties that he was acting as the agent for the owners in the sale of the land. That evidence furnishes ample proof of a lack of good faith which warranted the commissioner in suspending his renewed license for sixty days.

■ The relationship between the broker and the owners of the land was fiduciary in its nature. The broker was bound to exercise the highest degree of good faith toward the owners. The authorities are uniform to the effect that such an agent may not secure an advantage over his principal by misrepresentation, deceit or concealment of essential facts of the transaction. (*Calmon* v. *Sarraille,* 142 Cal. 638, 641 [76 P. 486]; *Weiner* v. *Mullaney,* 59 Cal.App.2d 620, 638 [140 P.2d 704]; *Thompson* v. *Stoakes,* 46 Cal.App.2d 285, 289 [115 P.2d 830].)

■ When the agent obtains a secret benefit from the transaction, the burden is on him to show that it was not procured

by unfair means or deception. (*Williams* v. *Lockwood*, 175 Cal. 598, 601 [166 P. 587].) In the present case the burden was on petitioner to show that the option to purchase the land in his own name was fairly procured without deception or concealment of the essential facts of the transaction. The evidence in this case supports the conclusion that the broker obtained the option by concealing from the owners the true facts and by misrepresentation of material facts. (*Rattray* v. *Scudder, supra.*)

The cases cited and relied upon by petitioner to rebut the conclusion that he was guilty of bad faith in the real estate transaction are not in conflict with the foregoing authorities. Those cases are all distinguishable on the facts involved. They do not show a continuation of the broker's agency to sell land, as the facts of this case do. They disclose absolute terminations of the fiduciary relationships of the parties. They do not show misrepresentations and deceptions as the present case does.

The recent decision in the Rattray case, *supra*, is determinative of all the essential issues of this case. The facts of that case are remarkably similar to those of the present action, except that, upon a petition for a writ of mandamus, the trial court there reversed the order of the Real Estate Commissioner denying petitioner's application for renewal of his license, and directed its issuance. The Supreme Court reversed the trial court and sustained the order of the commissioner. In this case the trial court sustained the order of the commissioner granting a renewal of the license, conditioned upon its suspension for a period of sixty days, pursuant to the provisions of the Business and Professions Code, as disciplinary penalty for violating the trust imposed on the real estate agent and for failure to show good moral conduct.

In this case the record leaves no doubt that the petitioner was acting as the agent of the owners in the sale of the King property which was the subject of investigation by the commissioner. It is clear that the agent procured an option in his own name by means of misrepresentations, and that he failed to disclose to the owners that he then had a purchaser of the land for a price which was $1,500 in excess of the price which he induced them to accept. It is evident that the owners would not have accepted $8,500 for their ranch if they had known that their agent was selling it for $10,000. Such mis-

representations and concealment constitute a breach of trust and fraud.

The Rattray case determines that, "A real estate license can be denied if the applicant fails to furnish proof of 'honesty, truthfulness and good reputation.' (§§ 10150, 10152.)" Certainly, if a license may be denied on that ground it can be suspended for a brief period of time, for the same reason. In support of the statement of law, in that case, that "Violation of his [a real estate agent's] trust is subject to the same punitory consequences that are provided for a disloyal or recreant trustee," the Supreme Court announces the well established principle, supported by numerous authorities, that:

"Such an agent is charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect the principal's decision."

Regarding the evidence of fraud and concealment in that case, which is also applicable to the facts of this case, the court said:

"He not only failed to disclose the truth but made the misrepresentation that he was unable to sell the property at the price placed upon it by Humston. Even if plaintiff had not been Humston's broker and under no fiduciary duties, once he discussed the question whether a higher price was obtainable, he had to 'speak the whole truth, and not by partial suppression or concealment make the utterance untruthful and misleading.'"

After holding that "A broker employed to find purchasers for the property of his principal can be given an option, 'running concurrent with the agency' to purchase the property," the Supreme Court says that, under such circumstances, the broker may not take advantage of his option and gain a profit thereby without first fully informing the owner that he has a purchaser who has agreed to pay him a higher price than that which the owner has agreed to accept. Upon that principle, the court quotes with approval from 8 American Jurisprudence, at page 1040, section 93, as follows:

"If a broker employed to sell property is also given . . . an option to purchase the property himself, he occupies the dual status of agent and purchaser and he is not entitled to exercise his option except by divesting himself of his obligation as agent by making a full disclosure of any information in his possession as to the prospect of making a sale to another."

Upon that same subject the court quotes with approval from section 390(a) of Restatement of the Law of Agency, as follows:

"Before dealing with the principal on his own account, . . . an agent has a duty, not only to make no misstatement of fact, but also to disclose to the principal all material facts fully and completely. A fact is material . . . if it is one which the agent should realize would be likely to affect the judgment of the principal in giving his consent to the agent to enter into the particular transaction on the specified terms. Hence, the disclosure must include not only the fact that the agent is acting on his own account . . . , but also all other facts which he should realize have or are likely to have a bearing upon the desirability of the transaction from the viewpoint of the principal."

The foregoing principle is sound law. It protects the owners of land from fraud and deceit which too frequently result in substantial loss. Any other rule would violate the established law with respect to fiduciary relationships, and enable an agent to fraudulently procure an option from his principal for the purpose of secret personal enrichment. Such conduct may not be countenanced by the law.

The foregoing decision fits the facts of this case exactly. It is determinative of this action.

Finally, the appellant contends that the trial court failed to adopt a specific finding that he was acting as the broker and agent of the owners of the land in procuring the sale to the Fritcheys. The court did not adopt a specific finding on that issue. But the court did determine that the commissioner's findings that Mr. Bell did not show good faith in that transaction of sale to the Fritcheys, and that he failed to meet the requirements of section 12 of the Real Estate Act, were true. The failure to find that petitioner was acting as the agent and broker in the sale of the land to the Fritcheys is harmless. The crux of this case is the failure of petitioner to establish to the satisfaction of the commissioner his good reputation as a broker. The evidence which was adduced abundantly shows bad faith and a lack of the characteristics required by said section of the Real Estate Act. Findings should be construed to support and uphold the judgment, rather than to defeat it. (*Ensele* v. *Jolley,* 188 Cal. 297, 303 [204 P. 1085].) It is apparent, in support of the judgment,

that if a specific finding had been adopted on the issue of the agency of the petitioner, it would have been adverse to him.

When there are adequate findings to support the judgment, it is immaterial that there is no specific finding on some other issue which, if made in support of the judgment, would not require a different conclusion from that which was reached by the court. (*Wolfsen* v. *Smyer*, 178 Cal. 775, 786 [175 P. 10]; *Angelus Securities Corp.* v. *Luton*, 47 Cal.App.2d 262, 268 [117 P.2d 741].) There is an abundance of evidence to show that appellant acted as the agent of the owners in the sale of the land.

The judgment is affirmed.

Adams, P. J., and Peek, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 1, 1947.