[Civ. No. 26099. Second Dist., Div. Four. Nov. 21, 1962.]

FRANK M. SHEPPARD et al., Plaintiffs and Respondents, v. RAY A. WILCOX et al., Defendants and Appellants.

R. D. Sweeney and Cameron W. Cecil for Defendants and Appellants.

Sidney Knable, Hill, Farrer & Burrill and William S. Scully for Plaintiffs and Respondents.

BURKE, P. J.—The brief but tempestuous corporate existence of Crestlawn Memorial Park Association (Crestlawn) has been marred by a bitter struggle between two groups of stockholders seeking to wrest control of the corporation from one another. In a complaint filed on January 20, 1958, plaintiffs' group sought to recover its controlling interest in the common stock of Crestlawn which was shifted to defendants'[1] group when the latter, acting as the board of directors, caused the corporation to issue sufficient common stock to

[1] As used herein, "defendants" will exclude Crestlawn unless otherwise indicated.

itself to divest plaintiffs of voting control. The court below gave judgment for plaintiffs and declared defendants constructive trustees of the improperly issued stock for the benefit of plaintiffs and also enjoined defendants from disposing of such stock or from taking any other action detrimental to plaintiffs with respect thereto. Defendants, including Crestlawn, have appealed from the judgment.

Crestlawn is a corporation engaged in the operation of an endowment care cemetery located in Riverside County. It was originally incorporated on March 20, 1952, and on November 10, 1952, the Corporations Commissioner issued his first permit to the corporation to sell and issue its securities. Under this permit Crestlawn was authorized to sell and issue: (1) to Atlas Cemetery Sales Company, Inc. (Atlas) an aggregate of not to exceed 55 shares of its preferred stock and 55 common in units of one preferred and one common as consideration for funds advanced or expended on behalf of the corporate entity; (2) to Sidney Knable an aggregate of not to exceed 20 preferred and 20 common in units of one and one as consideration for legal services rendered by him to appellants; (3) an aggregate of not to exceed 2,000 of each of its preferred and common shares similarly in units of one and one at and for the price of $100 per unit; and (4) as often as a common share or shares are sold under paragraph 3 to issue a certificate evidencing a like number of its common shares to Atlas but not to exceed in the aggregate 2,000 of its common shares as consideration for promotional services rendered by it to applicant. Preferred stock had a par value of $95 per share and carried a 6 per cent per annum cumulative dividend. The common stock had a $5.00 par value.

The shares issued under paragraphs 1, 2 and 4, herein termed "promotional shares," were required to be escrowed but not the shares issued under paragraph 3, termed "investment shares."

By virtue of assignments subsequent to the original issuance of shares in units, the investment group became and are the holders of a majority of the nonvoting preferred shares and the promoters similarly held a majority of the voting common stock. As a result, the promoters became the controlling group with respect to voting power in the corporation. However, the exclusive voting right of the common shares remains unimpaired only so long as preferred dividends are not allowed to accumulate unpaid for a period greater than two years. When the latter occurs the right

to elect a majority of the board of directors shifts to holders of the preferred shares.

The dividends on preferred stock were two years in default on September 1, 1956. Thereafter, pursuant to the provisions of their contract, the preferred shareholders held a meeting on February 13, 1957, and elected a majority of directors composed principally of defendants herein, but the promoters refused to recognize the directors thus elected. Plaintiffs, or their predecessors, the original promoters, wrongfully resisted defendants' efforts to obtain actual control of the books, records, and affairs of the corporation from and after February 13, 1957, until a series of suits litigated in the Riverside County Superior Court culminated in issuance of a mandatory injunction on October 4, 1957, which compelled plaintiffs to relinquish control. Defendants were thereby enabled to take over management of corporate affairs.

At about the same time, plaintiffs herein acquired their majority holdings of common stock. On September 30, 1957, Frank M. Sheppard and V. A. Sheppard (Sheppards) as pledgees, succeeded to the promoters' interest when they obtained the Atlas shares in return for cancellation of indebtedness underlying the pledge. Sheppards acquired other shares of common and preferred by cash purchase.

At a meeting of the new board of directors composed of defendants on December 3, 1957, it was resolved to borrow $50,000 from R. N. Sheffler, a member of the new board, with an option of taking repayment in common stock on the basis of $10 per share. Purportedly this was for the purpose of acquiring funds to pay certain debts of the corporation, including attorney fees incurred in the litigation leading to the injunction of October 4. The resolution also authorized issuance to attorneys Cecil & Sweeney of 2,000 shares of common as payment to each for attorneys' fees in the amount of $5,000. Additional resolutions were passed to (1) amend the articles of incorporation by increasing authorized common stock from 24,000 to 100,000 shares, and (2) make preferred shares convertible to common at the rate of 19 to 1 (par ratio) plus one share for each $5.00 of accumulated unpaid preferred dividends.

The Sheffler loan and the mode of payment to attorneys were rejected by the Corporation Commissioner, but a deputy in that office suggested an alternate plan, viz: to issue 10,000 shares of common stock on a pro rata basis to the holders of then outstanding paragraph 3 common stock. This plan was

accepted by the new board, a permit was issued by the commissioner on December 18, 1957, and 8,400 of the new common shares were sold to the investor group pursuant to this permit. Plaintiffs and the original promoters were not advised of these actions.

The effect of limiting sale of the new issue to investors only was to shift common stock voting control from plaintiffs' group to defendants' group. This was unacceptable to the former who first sought redress through the office of the commissioner.

On January 6, 1958, an accusation was filed by plaintiffs and others with the Corporations Commissioner protesting the issuance of the 1957 permit in that the permit excluded purchase by holders of common shares except those holders who had purchased under paragraph 3 of the original permit of November 10, 1952. The accusers further charged that the 1957 permit would prevent the holders of a majority of the common stock from retaining their positions as majority stockholders and would change the voting control of the corporation. On January 7, 1958, the 1957 permit was summarily suspended by the commissioner and notice of hearing given.

After certain hearings and rehearings before the commissioner, he rendered his decision on February 29, 1960. This decision was based on findings of fraud and concealment on the part of defendants which in several instances have but questionable support in the record. However, the commissioner made salient findings of fact as follows: (1) by virtue of the purchase of the 8,400 common shares under the 1957 permit, the defendants increased their percentage holdings of common stock voting power in Crestlawn from 42.3 per cent to 81.5 per cent and reduced the holdings of the voting power of the plaintiffs from 57.6 per cent to 18.8 per cent; (2) those persons associated with and controlled by defendants planned and agreed to perpetuate themselves in control of the board of directors of Crestlawn and its business affairs and management and sought the permit of December 18, 1957, with that in mind.

Thereupon, the commissioner determined that the permit of December 18, 1957, was neither fair, just nor equitable and caused it to be amended to require pro rata distribution of the new issue to all holders of common shares, investors and promoters alike. This decision, however, was not given

retroactive effect; consequently the 8,400 issued shares remained outstanding.

With respect to the commissioner's decision to amend the permit in the particulars noted above, two mandate actions, identified by appeal numbers 26091 and 26092, were instituted in the superior court by Crestlawn and defendants R. N. Sheffler and Ray N. Wilcox. One attacked a decision of the commissioner determining that the 1957 permit should be amended. On April 27, 1960, a second mandate action was filed attacking the validity of the final decision of the commissioner rendered February 29, 1960. The issue presented by the first writ of mandate was held to be moot by the trial court since the order complained of had been vacated by the commissioner subsequent to its issuance and the second writ of mandate was denied. Appeals in both matters are being considered concurrently herewith. (See *ante*, p. 43 [26 Cal. Rptr. 421].)

The present suit resulted in a judgment for plaintiffs. Although defendants make numerous attacks on the findings of the trial court, including the commissioner's findings which were incorporated therein, all to be considered below, one point emerges without substantial conflict, to wit: defendants utilized their position as majority directors on the new board to acquire a majority and controlling interest in common voting stock of the corporation. The finding of intention to bring about this result, while immaterial under our view of the case, is supported by substantial evidence and the inference to that effect is clearly supported in the record.

Defendants argue the effect of the trial court's decision here, whereby a pro rata distribution to all common stockholders of the new issue is achieved through the medium of constructive trust, is to confer preemptive rights on the shareholders of Crestlawn, a requirement abrogated by statute in California (Corp. Code, § 1106). Although stockholders in California may no longer exercise preemptive rights in California corporations, "nevertheless they have the right to demand that directors and officers of the corporation do not use their positions for their own personal advantage, or to discriminate between stockholders, or to so cause stock to be issued as to make a profit for themselves or to obtain or retain control of the corporation." (*Schwab* v. *Schwab-Wilson Machine Corp., Ltd.*, 13 Cal.App.2d 1, 3 [55 P.2d 1268]; *Shaw* v. *Empire Savings & Loan Assn.*, 186 Cal.App. 2d 401, 406 [9 Cal.Rptr. 204].)

"The idea of the State Bar Committee which drafted [Corp. Code, § 1106] in 1930 was that justice and convenience could be served more effectively by holding directors to high standards of good faith and fairness in the exercise of their power to issue shares rather than by any positive rule conferring preemptive rights." (Ballentine & Sterling, Cal. Corp. Laws (1962 ed.), § 99, p. 203; see *Shaw* v. *Empire Savings & Loan Assn.*, *supra*, 186 Cal.App.2d 401, 405.) So it has been said "One formula of fair dealing is universally recognized, i.e., directors may not authorize the issue of unissued shares to themselves for the primary purpose of converting them from minority to majority stockholders." *(Dunlay* v. *Avenue M etc. Co.*, 253 N.Y. 274 [170 N.E. 917].) Under these circumstances, a shareholder in California is said to have quasi-preemptive rights. (See *Shaw* case *supra*.) It is therefore proper for the court, in salutary exercise of its equitable jurisdiction, to restore the parties to their original balance.

The judgment remedies wrongful acts of defendants which substantially impaired plaintiffs' established interests and effects substantial justice for all parties since (1) the corporation is enabled to retain needed funds derived from the original sale, a need consistently urged by defendants, and (2) the former alignment of voting interests is restored.

As noted above, defendants' contention that the juxtaposition of control was a product of innocence, i.e. that a finding of intent lacks evidentiary support, is at best immaterial. A corporate director is held to fiduciary standards not only as respects the corporation but equally toward the shareholders. To argue that breach of a fiduciary duty is cured by ignorance under these circumstances is at once captious and callow, especially where the remedy available is eminently fair and restores the parties to their original relationship to one another without detriment to either side. Furthermore, we note in passing, defendants' management powers under their preferred share contract are limited to the time required to cure the default in dividends. No rational basis is provided thereby for making substantial changes in the alignment of power generally. Finally, defendants themselves admit that the impermissible effect of the stock issue in question is clearly evident to one with the facts before him. The intent to shift voting control in the corporation regardless of when it was formed attaches necessarily to defendants' activities here.

On appeal defendants assert plaintiffs are not entitled to obtain equitable relief because they came into court with unclean hands. As a basis for invoking this rule of equity defendants go into great detail concerning the efforts of certain of the promotion stock group, including some of the plaintiffs, to prevent defendants from exercising their right to elect a majority of the board of directors of Crestlawn. These controversies were the subject of the Riverside Superior Court actions. They do not relate directly to the transaction before this court. The principal parties involved in that litigation were predecessors in interest of plaintiffs, namely Atlas and David Settlemyre. During the period from September 22, 1956, and October of 1957 Atlas was fighting for retention of its position of voting control of Crestlawn and endeavoring to forestall the shifting of the right to elect a majority of the board of directors to the holders of a majority of the preferred shares. Substantially all of this earlier period preceded September 30, 1957, which was the date upon which the Sheppards acquired all of the shares of Crestlawn previously owned by Atlas.

Although neither Atlas nor David Settlemyre are parties to this action, the Sheppards were creditors of Atlas and loaned that corporation or its officers money from time to time, part of which loans financed some of the prior litigation with defendants, and plaintiffs' attorney Sidney Knable and his father-in-law Lawrence H. Slote, also were shown to be involved. Thus, it would be fair to attach responsibility for, or participation in, prior misdeeds of the promoters upon plaintiffs, or some of them, here. However, even though plaintiffs are regarded as guilty of misconduct in their prior relationship with defendants, it does not aid the latters' cause. As was said in *Moriarty* v. *Carlson,* 184 Cal.App.2d 51, 57 [7 Cal.Rptr. 282], " 'The misconduct must infect the cause of action before the court. Relief is not denied because the plaintiff may have acted improperly in the past or because such prior misconduct may indirectly affect the problem before the court. A party may have relief in connection with a transaction itself untainted although his original title may have been tainted by improper conduct.' " In *Boericke* v. *Weise,* 68 Cal.App.2d 407, 419 [156 P.2d 781], the court said, "Of course if a party comes into a court of equity with unclean hands relating to the transaction before the court, he will be denied relief. But in determining that issue the

trial court can properly consider only whether the moving party has clean or unclean hands in relation to the matters properly before the court. The trial of the issue relating to clean hands cannot be distorted into a proceeding to try the general morals of the parties. To warrant denial of relief the unclean hands must relate to the transaction before the court.''

As noted above, the prior transactions to which the assertion of unclean hands is directed are not the transactions before the court in the instant case. The misconduct alleged as a basis for this defense was remedied in the Riverside actions and has become moot. The wrong done to plaintiffs here is independent; retribution for earlier wrongs cannot be vindicated under the doctrine of unclean hands.

Defendants rely upon *DeGarmo* v. *Goldman*, 19 Cal.2d 755 [123 P.2d 1], to support this defense. But there, in reversing the trial court, the Supreme Court pointed out that certain evidence tending to inculpate plaintiff in matters pertaining to the alleged misdeeds of defendants was excluded. The conduct of plaintiff alleged in support of the defense was inextricably interwoven in the identical transactions at issue in plaintiff's suit, clearly distinguishing that case from the present.

Defendants contend that the Commissioner of Corporations properly recognized a clear distinction between the promotion shareholders and the investment shareholders in his permit of December 18, 1957, and was justified in restricting the right to purchase the new issue of shares to the investment shareholders. This contention lacks merit because even a strained construction of the language of the permit fails to support the conclusion. The purpose of distinctions made by the permit is to limit the number of shares which the promoters could take in return for promotional services; it is a device to protect the investment of those who buy shares for cash. Rights of holders of promotional shares are not restricted excepted insofar as limitations are imposed on transfer by the escrowing requirement. Furthermore, there were transmutations of ownership which altered the balance envisaged by the original permit. Distinctions existing between the shares as originally issued and as outstanding today are not the same. Additionally, it may be noted the commissioner recognized and corrected the error of permitting the distinction to be made by subsequently amending the initial permit after finding that it was unfair and unjust and constituted a

breach of trust on the part of defendants as officers and directors of Crestlawn. An attack could have been made upon all shares issued under the permit because they were tainted with fraud. The commissioner limited his remedial action to amending the permit which he had issued.

The trial court went one step further and chose properly to declare a constructive trust as to the stock issued in favor of the persons justly and equitably entitled to them.

■ Defendants argue that "The trial court also found this permit [the 1957 permit] valid." This is a specious argument. By the time the matter reached the court the permit was an accomplished fact and as indicated the court chose not to attack the validity of the shares issued under it but to impose a constructive trust upon those in whose hands the shares were being held at the time of its judgment. Thus, it followed the reasoning of the court in *Angelus Securities Corp.* v. *Luton,* 47 Cal.App.2d 262, 268 [117 P.2d 741], "Concerning the question of holding in trust the property wrongfully received, the law is clear that where one gains property by violation of a trust or through wrongful act, he becomes an involuntary trustee of the thing gained for the benefit of the person who otherwise would have possessed it. [Citation.]. . . . 'In giving relief for a breach of trust, a Court of Equity endeavors, in the first place, as far as possible, to replace the parties in the situation they would have been in if no breach of trust had taken place. And for this purpose, when the trust property has been improperly disposed of, and is capable of being followed in specie, it will compel the trustee, or the party in possession, with notice, to reconvey it.' . . . [Citation.]"

Defendants contend that the Sheppards and Elmquists were not shareholders of record on the date of issuance of the 1957 permit and therefore are not proper parties to the action; further that plaintiffs Lawrence H. Slote and Laura May Kimbrel were holders of paragraph 3 shares (investment shares) and as such were entitled to their proportionate share of the stock issued under that permit and cannot complain of the restriction of such permit that only paragraph 3 shareholders would be eligible to purchase such shares. They next point out that Wilhelmina Dolman, not a party to this litigation, was the holder of 40 shares of the common stock issued under paragraph 3 and was entitled to purchase shares under the 1957 permit. However, she did not do so prior to the date that permit was suspended.

Although several of plaintiffs were not record holders of their shares on the books of the corporation at the time the wrongful actions were commenced by defendants, they were the actual owners thereof at that time. Stock records are regarded as conclusive upon exercise of certain stockholder rights, including the right to institute a derivative suit (Corp. Code, § 834), but the rule is long established which permits a shareholder to remedy a personal wrong occuring through breach by directors of their fiduciary duties notwithstanding lack of recordation of his interest on the corporate books. *(Parrott* v. *Byers,* 40 Cal. 614, 625-626; *Ashton* v. *Zeila Mining Co.,* 134 Cal. 408, 410-411 [66 P. 494].) An action like we have here is not derivative in nature, i.e. it does not remedy a wrong done to the corporation. Where one group of stockholders causes shares to be issued to themselves in order to change their status from minority to majority shareholders, the essence of the case is not fraud against the corporation but fraud against the other group of stockholders *(Schwab* v. *Schwab-Wilson Machine Corp., Ltd., supra,* 13 Cal.App.2d 1, 4. See also *Shaw* v. *Empire Savings & Loan Assn.,* 186 Cal.App.2d 401, 407 [9 Cal.Rptr. 204]). The cause of action is personal to the injured shareholders and is not concerned with the provisions of section 834 of the Corporations Code governing derivative actions.

What the defendants assert pertaining to plaintiffs Slote and Kimbrel is also true of the three Elmquist plaintiffs, since each of this group owned investment shares. However, as has been pointed out, the news of the securing of the permit and of the newly authorized issue was kept secret from plaintiffs until defendants had completed the purchase of the 8,400 shares, and while it is true that plaintiffs in the instant case include in their number holders of investment shares as well as promotional shares and do not include all of the aggrieved shareholders, no prejudice to defendants results therefrom. The principal thrust of the judgment is to remedy defendants' breach of trust rather than to confer a benefit on plaintiffs. A court of equity will always dispose of the entire controversy before it and will do full and complete justice to all who may have an apparent right or interest to be served by the judgment. (See *Whitehead* v. *Sweet,* 126 Cal. 67, 75-76 [58 P. 376].)

Defendants assert that the trial court had no jurisdiction in this matter since under section 25318 of the Corporations

Code the person aggrieved by a permit of the Commissioner of Corporations may apply to the superior court for relief within 60 days of the issuance of the permit. Here defendants point out that the trial court concluded that the 1957 permit issued by the commissioner ''was and is unfair, unjust and inequitable both to Crestlawn and to plaintiffs.'' Such a conclusion, they argue, surely indicates that the trial judge was acting upon the erroneous assumption that he had some authority in the law to pass upon the fairness and justness of the permit issued by the commissioner. ▮▮▮ Defendants assert the remedy prescribed by section 25318 of the Corporations Code is exclusive and that the court had no jurisdiction in an injunction proceeding to determine whether or not the 1957 permit was just, fair or equitable. Actually, when plaintiffs learned of the permit they took prompt action, entirely in keeping with the Corporations Code, to apply to the commissioner to remedy the wrong perpetrated by defendants in securing the issuance of a permit. They filed their accusation and the commissioner acted immediately in suspending the permit and setting the matter down for hearing. This procedure was entirely correct as there was no need to apply to the court until after the commissioner had been given the opportunity to reconsider the matter in the light of the information which had been withheld from him.

The complaint which was filed in court in the instant action was not directed against the commissioner but against the parties who had wrongfully benefited through the stock issuance and it sought to remedy the wrongful action of defendants and not activities of the commissioner.

Finally, defendants argue that the findings material to the judgment adverse to defendants are not supported by and are contrary to the evidence. The allegations of error in this regard are numerous, and in several instances have merit if the question of materiality is excepted. These findings prepared by counsel for the prevailing party bespeak the apparently complete lack of amity among the competing groups and reflect the bitter tenor of their dispute. We have reviewed, insofar as the briefs have directed our attention to relevant portions, the voluminous transcripts of testimony taken in the commissioner's hearings and trial of the instant case. In each instance many of the lengthy findings are not material to the judgment and in certain particulars are not supported by the evidence. But the decision is supported by the findings that the stock issued here shifted voting control

to defendants and that defendants intended that result to follow. Other findings of improprieties on the part of defendants, or some of them, are in many respects unsupported by evidence and should be disregarded. For example, the finding that defendants represented to the commissioner that plaintiffs and Atlas had been guilty of damaging and detrimental acts to and in relation to Crestlawn which had been adjudged as misconduct by a Riverside Court, is directly contrary to the evidence. While there is no denial that defendants' attorney represented to the commissioner that certain of plaintiffs' acts or those of their predecessors were detrimental to the corporation, and this has not been vigorously denied, there is no evidence to support the finding that counsel for the corporation had represented to the commissioner that such acts had been judicially adjudged to be misconduct. The record makes it clear that, in comparison, the overall conduct of plaintiffs or their predecessors fares no better, if not worse, than that of defendants.

But comparisons of conduct have been disposed of above in considering the doctrine of unclean hands and material findings which support the judgment inescapably emerge from the record and are sustained by substantial evidence. ██ As stated in the early case of *Wolfsen* v. *Smyer*, 178 Cal. 775, 785-786 [175 P. 10], "[These] findings . . . support the judgment, and the rule is that when there are sufficient findings on issues made in the case to support a judgment it is immaterial that there is no finding, or an erroneous finding, on some other issue which, if made, or differently made, would not compel any different conclusion from that reached by the findings which were actually made."

██ "The judgment of the trial court 'must be affirmed if the findings, supported by the evidence, are sufficient to warrant the relief granted on any legal theory.' [Citations.]" *(Hay* v. *Allen,* 112 Cal.App.2d 676, 681 [247 P.2d 94]).

Judgment affirmed.

Jefferson, J., and Ford, J.,* concurred.

A petition for a rehearing was denied December 19, 1962, and appellants' petition for a hearing by the Supreme Court was denied January 16, 1963.

---

*Assigned by Chairman of Judicial Council.