FOX, P. J.
 

 This is an action brought by the Menzels, as sellers of certain real property, against Salka and Thornton, real estate agents with whom the Menzels had listed their home for sale, to recover alleged secret profits and commissions. Defendants appeal from a judgment in favor of plaintiffs for $5,000 secret profits and a $2,500 commission.
 

 The Menzels gave defendants an exclusive listing on the property from February 3, to May 7, 1957, with an agreed commission of 5 per cent of the selling price. Defendants procured a buyer, Mrs. Lina Rosenstein, and on February 27, 1957, the Menzels and Mrs. Rosenstein opened an escrow at the Bank of America covering the purchase of the property. This escrow was numbered 213-9132. The agreed price to be paid by Mrs. Rosenstein to the Menzels was $62,000 and the commission to be paid to defendants was $2,500. Mrs. Rosenstein paid $6,200 cash into escrow as a deposit. On April 10 and 11, 1957, Mrs. Rosenstein informed Salka that she could not complete the purchase of the property and that she was willing to take $1,200 for her equity and would forfeit the balance of the $6,200 to be relieved of her contract. Salka did not inform the Menzels of Mrs. Rosenstein’s offer, but instead, he opened an escrow between himself and Mrs. Rosenstein on April 12, 1957, by the terms of which Salka was to purchase
 
 *616
 
 the property from Mrs. Bosenstein for $57,000 and receive a credit of $5,000, being the balance of the deposit made by Mrs. Bosenstein in her escrow with the Menzels. The new escrow was opened at the same branch of the Bank of America and was given the number. 213-9132A and was maintained in a file separate from the Menzel-Bosenstein escrow (No. 213-9132). The same escrow officer, a Mrs. Downing, handled both transactions.
 

 At no time between April 10, and April 16, did Salka notify the Menzels that he was dealing with Mrs. Bosenstein. On April 17, Salka and Thornton called at the Menzels’ home. The first item discussed at this meeting related to a lien which was outstanding on the property. Salka suggested to the Menzels that if they wished to withdraw from the transaction they could do so without difficulty and that because of the existing lien, they could not give clear title. The Menzels informed Salka and Thornton that they would clear the title and that they wished to go through with the deal. As to the balance of the conversation of the 17th, the testimony is conflicting in several particulars. Salka testified that he told the Menzels that: ‘‘They [the Bosensteins] * are not going to complete the transaction on the basis of the way it has been originally set up because they have approached me and asked me to purchase their interest or equity in the property, and that I have accomplished this, and that an escrow is now open within your escrow at the Beverly Wilshire branch of the Bank of America in Mrs. Downing’s office, and that I have made a, placed a deposit in the amount of $5,700, or ten per cent of the purchase price of $57,000 which I am going to pay for the house in my purchase from Lina Bosenstein, and I want you to know this because it is my fiduciary relationship to indicate to you, as your agent, that I am becoming a principal in this transaction.” Salka further testified that he told the Menzels: “I am going to buy the house. I can see no reason why it shouldn’t close, because I’m going to use a portion of the Bosenstein money in addition to having put up the $5,700 into this escrow.” and also that; “they could succeed to my position; if they felt they wanted to take advantage of my position, they were welcome to do so. . . .” Under cross-examination, Salka admitted that at no time did he tell the Menzels that he was acquiring the $6,200 deposit for $1,200.
 

 * Apparently both Mr. and Mrs. Bosenstein were negotiating for the property but only Mrs. Bosenstein went into escrow.
 

 
 *617
 
 The defendant Thornton testified that during the meeting of April 17, he informed the Menzels as follows: “Because of the law of agency we must inform you of any transaction that takes place or has taken place, and I want it clearly understood that though Mr. Salka is in escrow now with the Rosensteins for the purchase of your house at $57,000, that you can accede to his position. Mr. Salka in his deal made it contingent upon Mr. Rosenstein getting title thereto or Mrs. Rosenstein getting title thereto; and if you wish to get into Mr. Salka’s position in this transaction in any way that you want, I will back you up. You can go to the escrow. . . . Mr. Menzel then said to me, ‘I don’t want to be bothered with the details of these things’ . . . And I said ‘Well, he is getting part of the deposit of the $6,200 that is in escrow’ . . . Whereupon Mrs. Menzel said, ‘Does Mr. Salka get the $6,200?’ And I said, ‘Virtually all of it,’ and I was going on to explain further when Mr. Menzel interceded and said again, ‘I don’t want to get into the details on this thing. . . .’ ” On cross-examination, Thornton was asked the following question: “Now Mr. Thornton, do you remember either Mr. Salka or yourself saying to Mr. and Mrs. Menzel that the Rosensteins were willing to give up $5,000 to get out of the deal?” Answer: “No.” Moreover, when Salka was questioned by the Menzels’ attorney under section 2055 of the Code of Civil Procedure, he testified as follows: Question: “Yes. Now, having heard this letter, may I ask you again, Mr. Salka, did you on April 17th tell Mr. and Mrs. Menzel that you had bought out the $6,200 deposit of Mr. and Mrs. Rosenstein at a $5,000 discount for $1,200?” Answer: “I did not.’’
 

 Concerning the conversation relative to Salka’s purchase of the house, Mr. Menzel testified as follows: “Question: Well, then, what happened? Answer: And then [there] was general conversation, and Mr. Thornton told us that Mr. Salka likes this house and would even consider one day to buy it from the Rosensteins. Question: What did you say? Answer: It’s her house so faj? as I was concerned. ‘It’s her house. She can do what she wants. ’ Question: Do you remember anything else being said at that time ? Answer: No, not that I recall what is bearing on this ease. Question: Did Mr. Salka or Mr. Thornton tell you that Mr. Salka was in escrow with Mrs. Rosenstein? Answer: No. Question: Was there anything mentioned about Mr. Salka having bought the house for $57,000 ? Answer: No. Question: Was anything said about Mr. Salka picking up the
 
 *618
 
 deposit of the Bosensteins for $1200? Answer: No.” Mrs. Menzel. testified in a like
 
 manner and to
 
 the same
 
 effect.
 

 It is obvious that the trial court believed the testimony of the Menzels and that it disbelieved the testimony of the defendants, for in its findings the court found that the Menzels had no knowledge nor were they informed by the defendants of any of the following facts: “ (1) Lina Bosenstein could not complete the purchase of plaintiffs’ property; (2) Lina Bosenstein was willing to sell the $6,200.00 deposited by her in Escrow for $1,200.00; (3) Saul M. Salka had entered into an Escrow with Lina Bosenstein to purchase the aforementioned property from Lina Bosenstein for the sum of $57,000.00; and (4) Saul M. Salka was credited with $5,000.00 deposited by Lina Bosenstein in the Escrow between plaintiffs and Lina Bosenstein.” Defendants, however, assert that these findings are erroneous as a matter of law. They argue that the evidence discloses without any doubt, that the Menzels had knowledge of Salka’s pending purchase of the property. They point to the admitted fact that the Menzels negotiated with Salka for the repurchase of certain appliances and in particular, a refrigerator and that at the time Mr. Menzel was talking to Salka, he asked Salka “to sell me an electric appliance, a refrigerator, which he
 
 got so
 
 cheap.” However, Mr. Menzel explained this remark with a further statement. In response to the question “How could he sell it to you if he [Salka] wasn’t buying the house?”, Mr. Menzel answered: “He will buy the house from Mrs. Bosenstein after the closing of the —what is this—escrow.” This latter statement was consistent with the position maintained by the Menzels throughout the trial; i.e., that they knew that Salka was intending to buy the house from Mrs. Bosenstein, but that they thought this was a separate transaction, quite apart from their sale to her. This position is entirely in harmony with the findings challenged by the defendants.
 

 Defendants further point out that on April 30, 1957, the Menzels executed a bill of sale in favor of Salka and his wife for certain of the household furnishings and contend that this act is inconsistent with the Menzels’ testimony that they had no knowledge of the agreement between Salka and Mrs. Bosenstein and that it is also inconsistent with the finding to the same effect. As to this transaction, Mr. Menzel testified that Mrs. Downing (the escrow officer) requested him and his wife to come down to the bank and sign a document and that when
 
 he saw that it was made out
 
 in favor of Salka, he ob
 
 *619
 
 jected vigorously, saying to Mrs. Downing: “We can’t; impossible [to] sign this document.” He further testified that Mrs. Downing told him they must sign the bill of sale “Because we sold this house to Mrs. Rosenstein” and that signing the document was only a “technicality.” The trial court could have inferred from this that the Menzels were not cognizant of the import of the document they were signing and that the statements of the escrow agent misled and confused them. Under the circumstances, the court reasonably could have concluded that the execution of the bill of sale did not have the effect of establishing actual knowledge on the part of the Menzels that Salka and Rosenstein had entered into a transaction for the sale of the property. Thus a legitimate inference remains, viz., that the Menzels believed that Salka was contemplating or had arranged for a purchase of the property from Mrs. Rosenstein
 
 after
 
 the close of the Menzel-Rosenstein escrow and that they did not know that a contemporaneous escrow between Salka and Mrs. Rosenstein had been opened.
 

 We come next to defendants’ argument that the Menzels had knowledge of the Salka-Rosenstein transaction through the escrow itself. In this connection, defendants argue that there was only one escrow and that the knowledge of the escrow agent regarding the nature of the Salka-Rosenstein transaction would thus be imputed to the Menzels, citing
 
 Thein
 
 v.
 
 Sticha,
 
 93 Cal.App.2d 295 [209 P.2d 13] and
 
 Early
 
 v.
 
 Owens,
 
 109 Cal.App. 489 [293 P. 136]. These cases stand for the proposition that the escrow officer, as an agent for all the parties to an escrow transaction, has knowledge of all of the contents of the escrow file and that such knowledge is imputed to the principals. The general rule stated in
 
 Early
 
 v.
 
 Owens, supra,
 
 has been greatly modified in later cases. (See
 
 Kroeher
 
 v.
 
 Hurlbert,
 
 38 Cal.App.2d 261 [101 P.2d 101];
 
 Thompson
 
 v.
 
 Stoahes,
 
 46 Cal.App.2d 285 [115 P.2d 830]; and
 
 Steiner
 
 v.
 
 Rowley,
 
 35 Cal.2d 713 [221 P.2d 9].) Moreover, that rule is not applicable in a case where there are in reality two escrows.
 
 (Thompson
 
 v.
 
 Stoahes, supra.)
 
 In the present case, the court found that the Salka-Rosenstein escrow was “separate and distinct” from the Menzel-Rosenstein escrow. Defendants assign this finding as error, arguing that in their second amended complaint the Menzels admitted that there was in fact only one escrow and that a finding contrary to such an admission is error. It is the rule that facts admitted
 

 
 *620
 
 by the pleadings are outside the issues to be tried
 
 (Fuentes
 
 v.
 
 Tucker,
 
 31 Cal.2d 1, 4 [187 P.2d 752]), and that findings contrary to such admitted facts will not support the judgment
 
 (County of Los Angeles
 
 v.
 
 Beverley,
 
 126 Cal.App.2d 89 [271 P.2d 965]). Assuming that the complaint admits there was only one escrow transaction, still defendants’ contention is without merit. The record discloses that the parties proceeded to trial on the theory that the question of whether there was one escrow or two escrows was in issue. During the course of the trial, no suggestion was made by defendants that the pleadings admitted there was only one escrow. Considerable evidence was introduced on this question without objection. Under these circumstances, the defendants may not now complain of a finding, amply supported by the evidence, that is contrary to the admission. Apropos this point is the observation in
 
 Weidenmueller
 
 v.
 
 Stearns etc. Co.,
 
 128 Cal. 623, 625 [61 P. 374] that: “This court does not look with approval upon the practice of trying a case in the lower court upon the theory that the pleadings are sufficient, and, without making any objection to them or to the evidence, raising the point here for the first time that some of the issues were, in fact, admitted.”
 

 Defendants further argue that even if the finding that there were two escrows is correct, nevertheless, the Menzels had constructive knowledge of the scope and extent of the Salka-Rosenstein transaction. The evidence discloses there were in fact two separate files maintained by the escrow officer. The Menzel-Rosenstein file was numbered 213-9132 and the Salka-Rosenstein file was numbered 213-9132A. An examination of these files, which were exhibits before the trial court, discloses that several documents which should have been in the “A” file only, were actually included in the original or Menzel-Rosenstein file. The documents pertaining to the Salka-Rosenstein escrow which were in the Menzel-Rosenstein file were (1) a settlement sheet, (2) a copy of the bill of sale for the household furnishings, (3) a statement of identity from the Land Title Company, and (4) a “beneficiary’s statement.” Defendant argues that these documents were at all times open to the Menzels and that a perusal of them would have shown that Salka was purchasing the property from Mrs. Rosenstein and that he was paying $57,000 for it rather than the $62,000 which the Menzels were to be paid. From this defendants argue that by simple arithmetic, the Menzels would have been apprised of the fact that Salka was acquiring
 
 *621
 
 the house for $5,000 less than the Menzel-Rosenstein contract provided and thus would have knowledge of the discount in that amount. An examination of the Menzel-Rosenstein file discloses that defendants’ assertions are correct. However, the information contained in that file was not such as to give the Menzels constructive knowledge of the only information crucial to this ease; i.e., that Mrs. Rosenstein had offered to sell her equity of $6,200 at a discount and that Salka had purchased it at the offered discount. The fact that Salka was paying only $57,000 for the property does not of itself impart such knowledge. The reduction of the purchase price could have resulted from some agreement or consideration of a nature entirely removed from the Menzel-Rosenstein transaction. There is no disclosure that Salka was in fact receiving the $5,000 discount as a result of the inability of Mrs. Rosenstein to complete the purchase. This is the vice of defendants’ conduct. They did not disclose the fact that Mrs. Rosenstein was willing to sell her equity for $1,200 and that Salka had purchased it. The case of
 
 Steiner
 
 v.
 
 Rowley,
 
 35 Cal.2d 713 [221 P.2d 9], is apposite. At page 718 the court said: “Notice of the contents of the escrow agreement is imputed through the escrow holder to the parties. (Citing cases.) The escrow instructions provided for payment of $2,000 to Rowley, and the Steiners are charged with notice that he would be paid that amount. However, knowledge that such payment would be made does not include notice that the consideration for it was the broker’s inducement of his principal to purchase the land. The escrow documents disclosed no illegal purpose for the payment. Rowley might have been entitled to it as reimbursement to him for advances which he had made for the vendor,
 
 or in connection with a transaction entirely unrelated to that of the Steiners.”
 
 (Emphasis added.) Thus it is clear that unless the Menzels had access to the Salka-Rosenstein or “A” file, they could not have ascertained anything more than that Salka was purchasing the property for $57,000. Such knowledge would not be sufficient to charge them with notice of the true nature of the Salka-Rosenstein transaction. Furthermore, the testimony of the escrow officer makes it clear that the Menzels did not have access to the “A” file and thus they are not chargeable with knowledge on that account.
 

 We next come to the defendants’ assertion that even if the Menzels had no knowledge of the Salka-Rosenstein transaction, still there was no “secret profit” accruing to Salka or any detriment to the Menzels which could form the basis of
 
 *622
 
 the judgment. It is true, as defendants contend, that the usual case involving secret profits of a real estate agent takes the form of a direct payment to the agent or of a “dummy” sale by the agent whereby he takes advantage of the difference between the price the buyer is willing to pay and the price the seller is willing to take. But the rarity of the transaction in this case does not militate against its unlawfulness nor does it relieve defendants of their fiduciary obligation of full disclosure to their principal of all facts affecting their principal’s interest in the transaction and their own interjection into the deal. The simple fact is, that the defendants withheld vital information from the Menzels, and by taking advantage of the withheld information, Salka was able to acquire the Menzel property at a $5,000 discount. Salka thus profited by the transaction in the amount of the discount, or $5,000. It is immaterial that the Menzels were paid exactly the amount for which they were willing to sell the house and which they had agreed to accept from Mrs. Rosenstein. Furthermore, it is immaterial that Mrs. Rosenstein might not have sold her $6,200 equity to the Menzels for $1,200. She did sell it to Salka for that amount, but Salka did not disclose to the Menzels that the offer had been made or that he was taking it upon his own behalf. Thus, through a breach of his fiduciary obligation, Salka acquired a $5,000 equity in the Menzels’ property; a secret profit to which he was not entitled. The various breaches of fiduciary duty committed by Salka (and by his employer, Thornton) are clear when measured by the principles stated in
 
 Realty Co. of America
 
 v.
 
 Burton,
 
 160 Cal.App.2d 178 at page 190 [325 P.2d 171] : “Under California law, there is imposed upon the real estate agent the same undivided service and loyalty that is imposed upon a trustee in favor of his beneficiary
 
 (Sands
 
 v.
 
 Eagle Oil & Refining Co.,
 
 83 Cal.App.2d 312, 318 [188 P.2d 782];
 
 Langford
 
 v.
 
 Thomas,
 
 200 Cal. 192, 197 [252 P. 602]). Section 2230 of the Civil Code charges such an agent with the duty of
 
 fullest disclosure of all material facts
 
 concerning the transaction in question that might affect the principal’s decision
 
 (Langford
 
 v.
 
 Thomas, supra,
 
 p. 196;
 
 Rattray
 
 v.
 
 Scudder,
 
 28 Cal.2d 214, 223 [169 P.2d 371, 164 A.L.R. 1356]). The agent is required to exercise the
 
 highest degree
 
 of good faith toward his principal. He may not obtain for himself an advantage over the latter by misrepresentation, deceit or
 
 concealment of the essential facts of a transaction (Bell
 
 v.
 
 Scudder,
 
 78 Cal.App.2d 448, 454 [177 P.2d
 
 796]).
 
 Unless otherwise agreed upon, an agent
 
 *623
 
 is burdened with the duty
 
 not to compete
 
 with his principal concerning the
 
 subject matter
 
 of the agency.” (Emphasis added.) See also
 
 Ward
 
 v.
 
 Taggart,
 
 51 Cal.2d 736 [336 P.2d 534]. In every aspect of the above rules, Salka and Thornton have been remiss. They did not exercise that degree of loyalty required of a trustee in favor of his beneficiary, for not only did they fail to make a disclosure of the essential fact of Mrs. Rosenstein’s offer, but the evidence also sufficiently discloses an active concealment of that fact. Moreover, Salka was guilty of a direct violation of his fiduciary duty when he competed with his principals concerning the subject matter of the agency. The right to the first refusal of Mrs. Rosenstein’s offer belonged to the Menzels, not to Salka. If the Menzels had accepted the offer, they would have been able to keep the house and, in addition, the $5,000 which Mrs. Rosenstein was willing to forfeit. Thus, by the act of buying Mrs. Rosenstein’s equity for himself, Salka was in direct competition with his principals with respect to that equity. As was said in
 
 Cicurel
 
 v.
 
 Plaza Service Corp.,
 
 20 Cal.App.2d 211, 213 [66 P.2d 706] : “It is well settled that an agent must use the utmost good faith and must not postpone his principal’s interest to his own
 
 or use information acquired in the course of his agency as a means of acquiring an advantage for himself
 
 (citing cases). ...” (Emphasis added.) The actions of Salka constitute a direct violation of this rule. From the foregoing it is apparent that Salka has made a secret profit at the expense of the Menzels and that the argument to the contrary made by defendants is not well taken.
 

 Finally, defendants argue that the agency relationship between themselves and the Menzels had terminated at the time they procured the buyer, Mrs. Rosenstein, and was therefore terminated prior to the time of her offer to sell her equity. It is true, that when defendants produced a buyer and the Menzels executed a contract of sale with that buyer, the defendants had earned their commissions.
 
 (Herring
 
 v.
 
 Fisher,
 
 110 Cal.App.2d 322 [242 P.2d 963].) It is also true that when the subject matter of the agency is sold or otherwise disposed of, the agency terminates.
 
 (E. A. Sirout Western Realty
 
 v.
 
 Gregoire,
 
 101 Cal.App.2d 512 [225 P.2d 585].) But in the present case, the sale of the property was in escrow and thus the transaction was not completed when Salka made his deal with Mrs. Rosenstein. Moreover, as admitted by their own testimony, defendants continued to act as agents and fiduciaries of the Menzels, and so informed them, after the opening
 
 *624
 
 of
 
 both
 
 escrows, and the Menzels continued to rely upon them in such capacity. In these circumstances, the fiduciary relationship between defendants and the Menzels was not terminated upon the opening of the escrow.
 

 Defendants’ further argument that the award of $5,000 for secret profits constitutes exemplary damages, since the loss to the Menzels could not be computed with accuracy, is not well taken. The judgment is not based upon a speculation as to what might have occurred had Salka performed his duty faithfully and disclosed the Rosenstein offer to the Menzels, but is rather, predicated upon the
 
 fact
 
 that Salka profited by reason of his breach of trust in the amount of $5,000. In this respect the judgment simply orders that Salka disgorge his ill-gotten profit.
 

 In view of the foregoing it is unnecessary to pass
 
 upon
 
 other questions discussed in the briefs.
 

 The judgment is affirmed.
 

 Ashburn, J., concurred.