[No. C041900. Third Dist. Nov. 3, 2003.]

JERRY L. ROBERTS, as Trustee, etc., Plaintiff and Appellant, v. PATTY LOMANTO, Defendant and Respondent.

1554

## COUNSEL

Hansen, Boyd, Culhane & Watson; Boyd & Kimball, Betsy S. Kimball; Banks & Watson, Lawrence R. Watson and James O. Moses for Plaintiff and Appellant.

Montague & Viglione, John D. Montague; Haley & Bilheimer, Allan S. Haley and John Bilheimer for Defendant and Respondent.

## OPINION

**SIMS, Acting P. J.**—Plaintiff Jerry L. Roberts owned Cable Park Shopping Center (the shopping center) in his capacity as trustee of the Vernon A. Cable Trust. He retained defendant Patricia Lomanto as his agent to sell the shopping center. Lomanto eventually offered to buy the property in her capacity as trustee of her family trust.[1] The parties executed a purchase agreement which stated the price as $11 million.

---

[1] In the trial court, and on appeal, Lomanto labels the parties "the Cable Trust" and "the Lomanto Trust." As Roberts points out, however, a trust is not an entity distinct from its trustees and capable of legal action on its own behalf, but merely a fiduciary relationship with

While still acting as Roberts's agent, Lomanto assigned the contract to a third party buyer, with Roberts's consent. Although Lomanto disclosed to Roberts that the third party was paying her an assignment fee, she refused to disclose the amount of the fee or the price the buyer had agreed to pay. After the deal had gone through, Roberts learned that Lomanto's assignment fee was $1.2 million and the buyer had paid $12.2 million for the property (including the assignment fee).

Roberts filed suit against Lomanto, seeking damages and equitable relief on multiple theories. On cross-motions for summary judgment, the trial court granted Lomanto's motion and denied Roberts's motion, finding Lomanto had not breached any duty to Roberts.

We disagree with the trial court's conclusion that Lomanto breached no duty to Roberts. Rather, we conclude that Lomanto, who was at all times acting as Roberts's agent and owed him a fiduciary duty, breached that duty by refusing to disclose to Roberts the details of the assignment transaction. We shall therefore reverse the summary judgment and remand the matter for further proceedings.

*Standard of Review*

Summary judgment is properly granted to a defendant who shows without rebuttal that the plaintiff cannot establish an element of his cause of action or that an affirmative defense bars recovery. (Code Civ. Proc., § 437c, subds. (o)(2), (p)(2).)

"A party is entitled to summary judgment if under the undisputed facts, or facts as to which there is no reasonable dispute, the party is entitled to judgment as a matter of law. [Citations.] A defendant moving for summary judgment must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense. [Citations.] Once the defendant meets its burden, the burden shifts to the plaintiff to set forth 'specific facts' showing that a triable issue of material fact exists. [Citations.] The moving party's affidavits must be construed strictly and the opponent's affidavits must be construed liberally, and any doubts as to the propriety of granting the motion must be resolved in favor of denial. [Citation.]

---

respect to property. (*Ziegler v. Nickel* (1998) 64 Cal.App.4th 545, 548 [75 Cal.Rptr.2d 312].) We therefore refer to Roberts and Lomanto, the persons who took the actions that led to this litigation, as the parties.

"On appeal, we independently review the trial court's ruling and apply the same legal standard that governs the trial court. [Citation.]" (*JEM Enterprises v. Washington Mutual Bank* (2002) 99 Cal.App.4th 638, 643–644 [121 Cal.Rptr.2d 458].)

■ In our independent review of a summary judgment entered in favor of a defendant, we (1) identify issues framed by the complaint; (2) determine whether the moving defendant has established facts which justify a judgment in the defendant's favor; and (3) determine whether the opposition of the plaintiff demonstrates the existence of a triable, material factual issue. (See *Bashi v. Wodarz* (1996) 45 Cal.App.4th 1314, 1318 [53 Cal.Rptr.2d 635].)

## The Complaint

The first amended complaint, which is the operative one, begins: "This action arises from a real estate broker's taking of secret profits in commercial real estate transactions with her client." It then alleges:

Lomanto was the exclusive listing agent and the exclusive leasing agent for the shopping center at all times after June 12, 1997. In the listing agreement between Roberts and Lomanto, she agreed her compensation would be limited to 2 percent of the sales price.

On or about August 27, 1998, Lomanto made an unsolicited offer to buy the shopping center from Roberts; she represented that it was not worth more than $11 million, and that she could arrange financing to close the deal promptly. Thereafter, she did not present any other buyers to Roberts.

Relying on Lomanto's expertise and the trust he reposed in her, Roberts entered into a written contract of purchase and sale with her on October 6, 1998. Although this agreement did not require consummation of the purchase until May 30, 1999, Lomanto was unwilling to complete it by then; subsequently, at Lomanto's request, the agreement was extended and modified.

After certain contingencies in the agreement were removed, Lomanto informed Roberts she would not close the transaction in her own name and requested permission to assign her rights to Pan Pacific. Roberts agreed to the assignment on Lomanto's express representations that the property was still worth no more than $11 million. Lomanto knew it was worth much more, but misrepresented the facts to induce Roberts to sell it for less than its true value.

During the close of escrow, Lomanto advised Roberts regarding many details and met with him for hours to resolve the final points. Although she

provided him one document disclosing her receipt of an assignment fee from Pan Pacific, she did not disclose its amount; nor did she disclose any information to correct her claim that the shopping center was worth no more than $11 million.

After escrow closed, Roberts paid Lomanto $110,000 as her commission on the sale. Thereafter, he read in the newspaper that Pan Pacific had bought the shopping center for $12.2 million. He immediately called Lomanto to ask about the discrepancy between this price and the $11 million he had received. Lomanto claimed she did not understand it. Roberts now believes that, in breach of Lomanto's agreement to limit her compensation to 2 percent of the sales price, she received an undisclosed profit of $1.2 million on the transaction, which she has refused to pay to Roberts.

Lomanto's conduct was wrongful on theories including fraud, breach of fiduciary duty, constructive fraud, negligent misrepresentation, breach of contract, common count (money had and received), and violation of Business and Professions Code section 17200 et sequitur. Roberts is entitled to general and special damages of not less than $1.2 million and exemplary damages according to proof, plus restoration of commissions of not less than $110,000. The court should also impose a constructive trust on Lomanto and require an accounting from her.

*The Evidence*

The following facts, which were adduced upon the motions for summary judgment, were undisputed.

Lomanto, a licensed real estate broker, became the exclusive leasing agent for the shopping center in 1987. In 1993, Roberts became the successor trustee of the Cable Trust, which owned the shopping center. Lomanto remained the leasing agent for the shopping center until it was sold.

In 1997, Roberts undertook to sell the shopping center. On June 12, 1997, he entered into an exclusive sales listing agreement with Lomanto; the parties extended the agreement on February 13, 1998. The extended agreement expired by its terms on December 31, 1998.

During the period of Lomanto's listing agreement, she submitted several third party letters of intent to Roberts. None resulted in a sale.

On October 6, 1998, Lomanto in her capacity as trustee of the Bell/Lomanto Family Trust entered into a purchase agreement with Roberts to

buy the shopping center for $11 million. However, a required contingency did not occur. The agreement thereafter expired by its terms.

On July 6, 1999 (after the expiration date on the face of Lomanto's sales listing agreement), Roberts and Lomanto entered into a second purchase agreement under which Lomanto again agreed to buy the shopping center for $11 million. This agreement contained the following provision, repeated verbatim from the prior purchase agreement: "**CONTINGENCIES. A. American Stores.** Seller acknowledges that *Buyers' principal, Patricia J. Lomanto, is and has been Seller's exclusive agent for leasing and selling of the Property* and in that capacity has ongoing responsibility for negotiating a new ground lease with American Stores (or its successor) . . . . Buyers acknowledge that their principal, Ms. Lomanto, shall continue to exercise her best efforts on Seller's behalf in this regard and is not in any respect released from her fiduciary obligations." (Italics added.) The agreement also provided, under the heading, "**Good Faith Performance**": "Buyers and Sellers shall each, diligently and in good faith, undertake all actions and procedures reasonably required to place the escrow in condition for closing as and when required by this Agreement." The agreement further provided that the buyer could assign her rights to a third party only with the seller's prior consent.

On or about November 12, 1999, Pan Pacific Retail Properties, Inc. (Pan Pacific) solicited Lomanto about assigning her rights under the second purchase agreement to Pan Pacific. She replied positively.

On November 30, 1999, Lomanto and Pan Pacific entered into an "Assignment and Assumption of Purchase and Option Agreement." Under this agreement, Lomanto assigned her right to purchase the shopping center to Pan Pacific in return for an assignment fee of $1.2 million. The agreement gives the "[a]ssumption [p]rice" for the shopping center as $12.2 million.

Also on November 30, 1999, Roberts executed a written consent to the assignment. This document does not state any of the assignment's terms, other than the assignee's name.

On December 15, 1999, Lomanto instructed the escrow holder to pay her a brokerage commission of $110,000 out of the sales proceeds on the transaction at close of escrow.

On or around December 23, 1999, the parties met to sign the closing papers for escrow. At this time, Roberts and his attorney learned that Lomanto would get an assignment fee; however, Lomanto refused to disclose its amount. Roberts signed the escrow instructions and closing documents without objection.

The transaction closed on or around December 31, 1999, and Pan Pacific received title to the shopping center. Pan Pacific paid $1.2 million in consideration for Lomanto's assignment of her contract rights. Lomanto also received her $110,000 commission from Roberts.

*Summary Judgment*

After Lomanto answered the complaint and the parties engaged in discovery, both sides filed motions for summary judgment.

The trial court issued an order granting Lomanto's motion and denying Roberts's. After finding that the material facts were undisputed, the trial court reasoned:

1. The second purchase agreement is a standard sale agreement, as Lomanto argues. As stated in the agreement, however, Lomanto was acting as Roberts's agent and owed him some fiduciary duties until the purchase agreement closed.

2. These duties did not include disclosing the amount of her assignment fee. First, Roberts could not unreasonably withhold his consent to the assignment. Second, the amount of the fee was not a material fact requiring disclosure because Roberts completed the transaction after being told that amount was confidential.

Based on this reasoning, the trial court summarily denied Roberts's motion.

The trial court thereafter entered judgment in favor of Lomanto. Roberts filed a timely notice of appeal.

DISCUSSION

I

*The Complaint*

First, we must identify Roberts's cause of action. Although his complaint alleges numerous legal theories, he asserted on summary judgment that it states only one cause of action: breach of fiduciary duty. It is that cause of action we shall review.

## II

### *A Triable Issue of Material Fact Exists with Respect to Whether Lomanto Was at All Times Acting as Roberts's Selling Agent*

Although Lomanto disputed her role as Roberts's selling agent on summary judgment, she does not directly attack the trial court's finding that, for purposes of summary judgment, she was indeed Roberts's agent at all relevant times. In a footnote, however, she repeats her prior assertion that her fiduciary duties after the negotiation of the second purchase agreement were restricted to her role as *leasing* agent. We disregard this assertion because it is not raised in a properly headed argument. (Cal. Rules of Court, rule 14(a)(1)(B); *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830–1831, fn. 4 [41 Cal.Rptr.2d 263].) In any event, it lacks merit on summary judgment, because the second purchase agreement plainly states that "Patricia J. Lomanto is . . . Seller's exclusive agent for . . . selling of the Property . . . ." The fact that this clause goes on to describe a specific fiduciary duty with respect to Lomanto's role as leasing agent is hardly enough to prove as a matter of law that the clause was meant to deal with only that form of agency. Moreover, Lomanto requested and received a $110,000 commission on the sale of the shopping center because she was Roberts's selling agent. In short, the evidence on summary judgment, at the very least, creates a triable issue of fact with respect to whether Lomanto was Roberts's selling agent at all times material to the sales transaction.

## III

### *Triable Issues of Material Fact Exist With Respect to Whether Lomanto Breached Her Fiduciary Duty*

■ To state a cause of action for breach of fiduciary duty, a plaintiff must show "the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach." (*Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1101 [3 Cal.Rptr.2d 236].) It is not disputed that Roberts pleaded these elements. ■ To be entitled to summary judgment, therefore, Lomanto had to show that Roberts could not establish a triable issue of fact on at least one element or that an affirmative defense bars recovery. (Code Civ. Proc., § 437c, subds. (o)(2), (p)(2).) Lomanto has not met her burden.

### *Fiduciary duties of real estate agents*

"The law imposes on a real estate agent 'the same obligation of undivided service and loyalty that it imposes on a trustee in favor of his beneficiary.'

[Citations.] This relationship not only imposes upon him the duty of acting in the highest good faith towards his principal but precludes the agent from obtaining any advantage over the principal in any transaction had by virtue of his agency. [Citation.] 'Such an agent is charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect the principal's decision.' [Citations.]" (*Batson v. Strehlow* (1968) 68 Cal.2d 662, 674–675 [68 Cal.Rptr. 589, 441 P.2d 101]; see also *Field v. Century 21 Klowden-Forness Realty* (1998) 63 Cal.App.4th 18, 25 [73 Cal.Rptr.2d 784]; *Jorgensen v. Beach 'N' Bay Realty, Inc.* (1981) 125 Cal.App.3d 155, 161–162 [177 Cal.Rptr. 882]; *Ford v. Cournale* (1973) 36 Cal.App.3d 172, 180 [11 Cal.Rptr. 334].)

"When a broker is engaged by an owner to market the owner's property, an agency relationship is created. The agent has fiduciary duties to the seller to disclose all material facts. *If the agent, or a relative or associate of the agent, purchases the property, the agent's fiduciary duties continue even though he or she may be a principal in the transaction.*" (2 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 3:17, pp. 86–87 (Miller & Starr) italics added, footnotes omitted.) In other words, "[o]*nce an agency relationship has been created between the agent and the seller, the agent is not absolved of fiduciary duties merely because he or she is also buying or selling as a principal.*" (*Id.*, § 3:28, pp. 161–162; italics added.) Thus, "[o]ne who acts as an agent and also deals with his principal as to the subject matter of the agency cannot take advantage of his principal by withholding from him information secured by means of the agency." (*Rattray v. Scudder* (1946) 28 Cal.2d 214, 224 [169 P.2d 371] (*Rattray*); see also *Steve Schmidt & Co. v. Berry* (1986) 183 Cal.App.3d 1299, 1313–1314 [228 Cal.Rptr. 689].)

A real estate licensee who "claim[s] or tak[es] . . . any secret or undisclosed amount of compensation, commission or profit or fail[s] to reveal to the employer of such licensee the full amount of such licensee's compensation, commission or profit under any agreement authorizing or employing such licensee to do any acts for which a license is required," is subject to discipline by the Real Estate Commissioner. (Bus. & Prof. Code, § 10176, subd. (g).) Such a licensee also violates his or her fiduciary duties toward the employer and will not be allowed to retain the undisclosed profit: "[A] real estate licensee, *while acting in his or her capacity as such,* must not receive any benefit from the transaction of his or her agency other than that which is known and accepted by the principal. The agent will not be permitted to retain *anything* that might otherwise derive from participation in the transaction unless the agent *fully* discloses the nature *and amount* of the benefit and receives the approval of the principal. *It is totally immaterial that the transaction is otherwise fair to the principal, or that the principal receives exactly the price wanted for the property* . . . ." (2 Miller & Starr, *supra,* § 3:32, p. 177; first & second italics original, others added; fns.

omitted; see also *Crogan v. Metz* (1956) 47 Cal.2d 398, 404–405 [303 P.2d 1029]; *Bate v. Marsteller* (1965) 232 Cal.App.2d 605, 611–614 [43 Cal.Rptr. 149]; *Menzel v. Salka* (1960) 179 Cal.App.2d 612, 621–623 [4 Cal.Rptr. 78]; *Bell v. Scudder* (1947) 78 Cal.App.2d 448, 454–456 [177 P.2d 796].) " '[T]he principal's right to recover does not depend on any deceit of the agent, but is based upon the duties incident to the agency relationship and upon the fact that all profits resulting from that relationship belong to the principal.' " (*Crogan v. Metz, supra,* 47 Cal.2d at pp. 404–405.)

### The scope of Lomanto's fiduciary duties toward Roberts

Lomanto asserts that whatever fiduciary duties she owed were fully discharged as a matter of law before Roberts consented to her assignment. We disagree.

The parties continue to dispute the character of their second purchase agreement, apparently seeing this point as dispositive on the scope of Lomanto's duty. As we explain, it is not.

Lomanto asserts that, as the trial court found, the parties' second purchase agreement was a binding and enforceable contract of purchase and sale as soon as the parties executed it. Relying on *McPherson v. Real Estate Commissioner* (1958) 162 Cal.App.2d 751, 754 [329 P.2d 12] (*McPherson*), Lomanto maintains that her fiduciary duties to Roberts terminated when the parties executed the purchase agreement.

Roberts continues to assert that either the second purchase agreement merely gave Lomanto an option, or that if it was a contract of purchase and sale it was not binding and enforceable when executed. He relies on *Rattray, supra,* 28 Cal.2d at page 224, which holds that where a seller's agent has an option to purchase the seller's property, the agent may not find another buyer willing to pay a higher price, then exercise the option, then resell the property to the other buyer without full disclosure to the seller.

We conclude that *McPherson, supra,* 162 Cal.App.2d 751, is distinguishable without regard to the nature of the contracts in that case, and in any event does not stand for the sweeping proposition asserted by Lomanto. We also conclude that the holding of *Rattray* does not depend on whether the agent there had an option or a binding contract of sale.

In *McPherson, supra,* 162 Cal.App.2d 751, a real estate discipline case, the subject broker was exonerated of making secret profits by fraud on the following facts: The broker's agent procured a buyer for the broker's principal, the seller. The buyer and seller executed a written contract of sale. After putting down a deposit, the buyer wanted out of the deal. The broker's

agent told the seller he would try to resell the property for the buyer, but would need a commission. The seller said he did not care what was done with the property. The broker's agent then got a second buyer and closed the deal with him at a higher price than the original selling price. The original seller testified he did not care that the property resold for a higher price and had no complaint against anyone. (*Id.* at pp. 752–753.)

The trial court and the reviewing court rejected the Real Estate Commission's finding that the broker had unlawfully obtained a secret profit due to the higher resale price. The reviewing court found that once the broker had negotiated a binding contract of sale with which the seller was satisfied, he had completed his services to the seller. (*McPherson, supra,* 162 Cal.App.2d 751, 754.) The court then generalized: "*While a real estate salesman owes to his client the highest degree of good faith once he has secured a binding and enforceable contract with a purchaser his services to his client have been performed.* No case has been cited to us holding that under such circumstances the broker breaches any duty to the first client by then undertaking in good faith to make a second sale of the same property for the purchaser." (*Ibid.*; italics added.)

*McPherson* is inapposite. Unlike in our case, the broker there was not acting simultaneously as an agent and a principal, and did not arguably fail to disclose material facts to the seller. Nor did the broker enter into a purchase agreement with the principal which expressly stated that the broker was still the principal's selling agent. (*McPherson, supra,* 162 Cal.App.2d 751, 753; see *Bate v. Marsteller, supra,* 232 Cal.App.2d 605, 612–613.) Because the *McPherson* court did not consider a case involving such facts, its purported rule, that an agent who obtains a binding contract for a client has no further duty toward the client, cannot be extended to cover the situation in our case. (Cf. *Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689] [cases not authority for propositions they do not consider].)

As for *Rattray, supra,* 28 Cal.2d 214, although the facts of the case involve an agent's option, its holding goes beyond those facts. The court expressly located that situation within the compass of an agent's general fiduciary duty to his principal: "One who acts as an agent and also deals with his principal as to the subject matter of the agency cannot take advantage of his principal by withholding from him information secured by means of the agency." (*Id.* at p. 224.) The court went on to find that the agent violated his fiduciary duty of disclosure toward the principal by failing to advise the principal fully about pending negotiations over the property, among other things. (*Id.* at p. 225.) Nothing in that holding depends on the fortuity that the agent had an option to buy the principal's property, rather than a binding contract of sale.

In fact, as we have discussed above, *Rattray* is one of the leading cases establishing the rule that a real estate agent's fiduciary duty toward his client does not terminate merely because the agent transacts business with his client as a principal.

Thus, contrary to the parties' belief, nothing at this stage turns on whether we construe their purchase agreement as a binding contract of sale, a nonbinding contract of sale, or an option—a point we do not decide. Whatever that agreement may be, its execution did not terminate Lomanto's fiduciary duties toward Roberts. ■ A real estate agent who has undertaken to represent a principal in a transaction does not cease to be his fiduciary merely because she enters the transaction as a principal in her own right. (2 Miller & Starr, *supra*, §§ 3:17, 3:28, pp. 86–87, 161–162.)

### Lomanto's breach

Lomanto asserts that as a matter of law she did not breach any fiduciary duties of disclosure toward Roberts by refusing to reveal the amount of her assignment fee because that fact was not material to his decision to complete the sales transaction. We are not persuaded.

1. *It is immaterial that Lomanto did not know about the assignment when the parties executed the second purchase agreement.*

Lomanto asserts that she could not have breached her duty of disclosure to Roberts by not telling him the amount of her fee because she had no knowledge of that fact before entering into the second purchase agreement with him. We disagree. Lomanto's argument depends on her claim that because the purchase agreement was a binding contract of sale, its execution completed the purposes of her agency toward Roberts and ended her fiduciary duties to him. We have already rejected that claim.

To put it another way, Lomanto's argument depends on the premise that the second purchase agreement is the only material agreement in this case. That premise is mistaken. After Pan Pacific solicited Lomanto about the assignment on or around November 12, 1999, she assigned her rights to Pan Pacific through a written contract executed on November 30, 1999. She knew when she executed that contract, and presumably earlier, that she would get an assignment fee of $1.2 million and that Pan Pacific would pay a total purchase price of $12.2 million. Yet the written consent to the assignment she obtained from Roberts on November 30, 1999, did not mention these facts; it did not even disclose the existence of an assignment fee. It is immaterial that she did not know them when she entered into the second purchase agreement with Roberts in July 1999, because that agreement did not complete the

transaction for which she served as his agent. ▇ Lomanto's contract of assignment with Pan Pacific, under which she in effect substituted Pan Pacific for herself as the buyer, became an essential part of the transaction, as did Roberts's consent to the assignment. Thus Lomanto's duty of disclosure extended to the assignment.

2. *Lomanto has not shown as a matter of law that it would have been unreasonable for Roberts to withhold consent to the assignment had he known the undisclosed facts.*

Lomanto asserts that the amount of her assignment fee was not material to Roberts's decision whether to consent to the assignment because (1) he could not have unreasonably withheld consent and (2) withholding consent would have been unreasonable where the assignee was ready, willing, and able to perform exactly as the assignor had agreed to do. We conclude that Lomanto has not supported these claims.

▇ As noted, a real estate agent's fiduciary duty of disclosure extends to all material facts—that is, all facts that might affect the principal's willingness to enter into or complete a transaction. (See, e.g., *Batson v. Strehlow, supra,* 68 Cal.2d 662, 674–675.) The test of materiality is objective: whether a reasonable person in the principal's position would have acted differently had he known the undisclosed facts. (*Jorgensen v. Beach 'N' Bay Realty, Inc., supra,* 125 Cal.App.3d 155, 160.)

To support her assertion that Roberts could not have unreasonably withheld consent to the assignment, Lomanto cites Civil Code section 711, which bars conditions restraining alienation "when repugnant to the interest created." However, she does not explain how Roberts's refusal of consent to an assignment, under a term of the parties' purchase agreement that expressly authorized him to do so with or without stating reasons, would have violated that statute.[2]

Nor does Lomanto cite any cases on point. She relies mainly on *Kendall v. Ernest Pestana, Inc.* (1985) 40 Cal.3d 488 [220 Cal.Rptr. 818, 709 P.2d 837], which holds that under Civil Code section 711 a *lessor* may not *unreasonably and arbitrarily* withhold consent to an assignment of a *lease* to a *sublessee.* (*Id.* at pp. 492, 506–507.) As the case does not discuss the assignment of a buyer's right to purchase property under a contract of sale, it is inapposite. (Cf. *Ginns v. Savage, supra,* 61 Cal.2d 520, 524, fn. 2.) Lomanto also relies on *Davies-Overland Co. v. Blenkiron* (1925) 71 Cal.App. 690 [236 P. 179], a

---

[2] Lomanto asserts: "[T]he anti-assignment clause arguably contained an implied covenant that consent could not be unreasonably withheld." "[A]rguably" does not meet Lomanto's burden as the moving party on summary judgment.

case concerning a conditional sales contract for an automobile in which the court found the seller had suffered no prejudice from the buyer's assignment to third parties in violation of an anti-assignment clause because they were prepared to pay the full purchase price to the seller. (*Id.* at pp. 693–694.) The case does not discuss whether the seller would have acted unreasonably by withholding consent to the assignment in the first place if the buyer had asked his consent. Thus it too is inapposite.

Lomanto further asserts on this point that if Roberts had refused consent to the assignment, Lomanto could have consummated the purchase on the original terms and then resold the property to Pan Pacific. As these facts are not before us and Roberts has not argued that such conduct by Lomanto would have breached her fiduciary duties to him, the relevance of this speculation escapes us. A resale is not an assignment. A resale would have required Lomanto to pay the purchase price—a nasty inconvenience that the assignment avoided.

Finally, Lomanto asserts that Roberts was not prejudiced by the assignment because Pan Pacific "offered to pay the full purchase price in cash." This assertion does not fit the facts. Pan Pacific offered *to Lomanto* to pay *more* than "the full purchase price" asked by Roberts. The critical question is whether Roberts would have consented to the assignment had he known the exact terms secretly agreed to between Pan Pacific and Lomanto. He has pleaded he would not have done so. Lomanto has not shown he would have been required to do so.

The unfairness in Lomanto's position is this: ■ When she entered into the assignment with Pan Pacific, she owed Roberts a fiduciary duty to obtain the best price for the property for Roberts.[3] However, Pan Pacific paid Lomanto $1.2 million that was presumably available to pay to Roberts, as part of the purchase price. There is nothing in the record to suggest that Pan Pacific cared to whom it paid its total purchase price. By refusing to disclose the million-dollar-plus assignment fee, Lomanto deprived Roberts of his ability to insist that the fee be paid to him as a part of the purchase price of the property. In this transaction, Lomanto clearly acted in her best interest and not in the best interest of her principal, in breach of her fiduciary duty to Roberts.

---

[3] Lomanto argues this is not so because Roberts admitted on summary judgment, "No written or oral agreement imposed an obligation on Lomanto to continue to solicit offers on Roberts [*sic*] behalf after July 6, 1999."

Regardless of whether Lomanto had a duty to *solicit* offers, she had a continuing fiduciary duty to obtain the best price for her principal when, in fact, a sale transaction with Pan Pacific was consummated.

### 3. *Roberts's "consent" in escrow does not prove the amount of Lomanto's assignment fee was immaterial to him.*

Lastly, Lomanto asserts (and the trial court found) that by agreeing to sign the papers to close escrow after Lomanto told him she would not disclose the amount of her assignment fee, Roberts proved the amount of the fee was not material to him. We disagree. This circular reasoning ignores the awkwardness of the position in which Lomanto's earlier failure to disclose had placed Roberts.

On this record it is at least arguable that Roberts could not reasonably have acted otherwise than he did. If he had refused to permit escrow to close, he would have failed to perform his legal duty of mitigating his damages. He would also have exposed himself to possible suit by Pan Pacific for breaching his obligations under the second purchase agreement. Thus, his decision to avoid these consequences, and to avoid litigation by Pan Pacific, does not prove that the amount of Lomanto's assignment fee was immaterial to him.

█ A plaintiff claiming damages must do everything reasonably possible to mitigate his loss, and cannot recover for harm that was reasonably foreseeable and avoidable. (See, e.g., *Spurgeon v. Drumheller* (1985) 174 Cal.App.3d 659, 665 [220 Cal.Rptr. 195].) Roberts knew as of November 30, 1999, that Lomanto had obtained an assignment, but so far as the record shows he did not know that the sales transaction would differ in any material way from what he and Lomanto had agreed to in their second purchase agreement. He first learned near the end of December 1999, in the middle of signing papers for escrow, that Lomanto was getting an assignment fee in an undisclosed amount. Thus, he first learned at that moment that Lomanto was reaping a previously undisclosed profit on the transaction in an unknown amount. In other words, he learned at that moment that he had suffered damage. █ Profits from a real estate transaction belong to the principal, not the agent, unless the principal knows of and consents to the agent's retention of profit. (*Crogan v. Metz, supra,* 47 Cal.2d 398, 404–405; 2 Miller & Starr, *supra,* § 3:32, p. 177.)

If Roberts had refused to sign the escrow papers, however, he stood to suffer much greater damages. Not only would the sale have fallen through, thus depriving him of his expected profit, but he might well have been sued by Pan Pacific.[4] Under the circumstances, signing the papers and permitting the deal to close was the only reasonable measure available to Roberts to mitigate his damages, as he was required to do. (*Spurgeon v. Drumheller, supra,* 174 Cal.App.3d 659, 665.) Any other course might have exacerbated them.

---

[4] We imply no view as to the merits of any such suit.

*Conclusion*

So far as the record on summary judgment shows, when Lomanto asked Roberts's consent to the assignment without disclosing even the fact, let alone the amount, of her assignment fee, she obtained that consent on materially incomplete information. Lomanto knew as of November 30, 1999, when she executed the assignment with Pan Pacific, that Pan Pacific was willing to pay $12.2 million, well over Roberts's asking price, and to bestow the difference on her as profit. Roberts did not know those facts when he gave his consent to the assignment on the same date.

 Because Lomanto's $1.2 million assignment fee is a form of compensation to her that was not disclosed to Roberts until after the sale of the shopping center was consummated, it is by definition a secret profit, as pleaded in Roberts's complaint. Under settled law, Lomanto may not retain it. The fact that the transaction yielded Roberts his full asking price does not change that result. (*Crogan v. Metz, supra*, 47 Cal.2d 398, 404–405; *Bate v. Marsteller, supra*, 232 Cal.App.2d 605, 611–614; *Menzel v. Salka, supra*, 179 Cal.App.2d 612, 621–623; *Bell v. Scudder, supra*, 78 Cal.App.2d 448, 454–456; 2 Miller & Starr, *supra*, § 3:32, p. 177.)

Roberts asks that we remand with directions that the trial court grant summary judgment to him on his motion. We decline to do so.

First, Roberts seeks not only the amount of Lomanto's assignment fee as damages, but also the return of her commission. He cites *Sierra Pacific Industries v. Carter* (1980) 104 Cal.App.3d at page 583 [163 Cal.Rptr. 764], for the proposition that a broker's deliberate failure to disclose a material fact, even if without fraudulent intent, deprives her of the right to retain a commission. (See also *Bate v. Marsteller* (1959) 175 Cal.App.2d 573, 583 [346 P.2d 903]; *Baird v. Madsen* (1943) 57 Cal.App.2d 465, 476 [134 P.2d 885].) However, in *Ziswasser v. Cole & Cowan, Inc.* (1985) 164 Cal.App.3d 417, 423–425 [210 Cal.Rptr. 428], the court distinguished Roberts's authorities and appeared to hold that only deliberately fraudulent or duplicitous conduct by a broker would justify depriving her of a commission for breaching her fiduciary duty of disclosure.

It is undisputed that Lomanto deliberately failed to disclose the amount of her assignment fee. However, the parties have not directed us to anything in the record that would throw light on Lomanto's motives for failing to disclose this fact, either when she obtained Roberts's consent to the assignment or when she revealed the assignment fee but failed to disclose the amount. Thus we cannot say as a matter of law that her conduct was deliberately deceptive or fraudulent, as *Ziswasser v. Cole & Cowan, Inc.*,

*supra,* 164 Cal.App.3d 417, appears to require in order to justify the harsh remedy of forfeiting her commission.

Second, Roberts's complaint seeks equitable remedies (constructive trust and accounting) as well as damages. We are not in a position to say whether these remedies are appropriate on the record before us.

For all the above reasons, we shall simply reverse the summary judgment in favor of Lomanto.

## DISPOSITION

The summary judgment is reversed. The matter is remanded to the trial court for further proceedings. Roberts shall receive his costs on appeal. (Cal. Rules of Court, rule 27(a).)

Morrison and Hull, JJ, concurred.

A petition for a rehearing was denied November 25, 2003, and respondent's petition for review by the Supreme Court was denied February 24, 2004.